IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MACLAREN EUROPE LIMITED,

Plaintiff,

-against-

ACE AMERICAN INSURANCE COMPANY,
a/k/a ACE USA,

Defendant.

Index No.: 11-cv-4688 (HB)

**DEFENDANT'S LOCAL RULE 56.1**
**STATEMENT OF MATERIAL FACTS**

Joseph K. Powers (JP 5504)
J. Gregory Lahr (JL 9969)
Thomas R. Orofino (TO 6171)
SEDGWICK LLP
125 Broad Street – 39th Floor
New York, New York 10004-2400
Telephone: (212) 422-0202
Facsimile: (212) 422-0925
*Attorneys for Defendant*
*ACE AMERICAN INSURANCE COMPANY*

NY/957116v1

Defendant, ACE American Insurance Company ("ACE") (incorrectly sued herein as "ACE American Insurance Company, a/k/a ACE USA"), by its attorneys, Sedgwick LLP, respectfully submits this Local Rule 56.1 Statement of Material Facts.

## STATEMENT OF MATERIAL FACTS

### A.    The Maclaren Organization

1.      During the relevant time period, the Maclaren organization consisted of several separately incorporated but family-affiliated entities based in England, Hong Kong and Norwalk, Connecticut.   The Maclaren Group was an English company created in the 1960s which manufactured and distributed baby strollers (Rastegar Dep., 62-64).

2.      In approximately 1999, the company was experiencing financial difficulties and it was acquired by the Rastegar family who invested capital and took the company private (Rastegar Dep., 65-66).

3.      An individual named Farzad Rastegar served as director of the Maclaren Group for the period from 1999 to approximately 2001 (Rastegar Dep., 59).

4.      Rastegar and his family also reorganized and restructured the organization during that time (Rastegar Dep., 66).

5.      A company named Maclaren Hong Kong Ltd. ("MHK") was formed during this period to assume responsibility for stroller manufacturing and act as the master licensor for distribution of Maclaren products on a global basis (Rastegar Dep., 66, 78).

6.      The mother and sister of Farzad Rastegar have always been the beneficial owners of MHK (Rastegar Dep., 67, 78).

7.      The Plaintiff Maclaren Europe Ltd. ("MEL") was created around 2000 to serve as the distributor of Maclaren products in Europe under a license agreement with MHK (Rastegar Dep., 64, 66, 78).

8.      Farzad Rastegar was the director of MEL for several years prior to 2002 (Rastegar Dep., 63, 68).

9.      The mother and sister of Farzad Rastegar are the beneficial owners of MEL (Rastegar Dep., 67-68).

10.     At all relevant times, management services for MEL were outsourced to a company named Acela Ltd. ("Acela") (Rastegar Dep., 74, 88).  Services provided by Acela for MEL included HR, IT, administration, accounting, and finance – which included responsibility for insurance (Rastegar Dep., 75-76, 158-59).

11.     Two Acela employees who were involved in insurance matters for MEL during the relevant time period were Helen Lynch, the human resources and administration manager, and Mark Woollven, an accountant (Rastegar Dep., 90-91).

12.     Acela also provided back-office services to other Rastegar family-owned businesses, including Maclaren's US distributor in Connecticut (Rastegar Dep., 75, 92; Toama Dep., 54, 59).

13.     The ultimate beneficial owners of Acela are the sister and mother of Farzad Rastegar (Rastegar Dep. 70, 74).  MEL and Acela operate out of the same office located in Long Buckby, Northamptonshire, England (Toama Dep., 10, 58).

14.     Maclaren USA, Inc. ("MUSA") was created around 2000 to serve as the distributor of Maclaren products in the United States (Rastegar Dep., 14, 61).

15.     In 2001 or 2002, Farzad Rastegar and his brother, Nader Rastegar, bought MUSA from the parent of MEL (*i.e.*, their mother and sister), and became its shareholders along with another business acquaintance (Rastegar Dep., 61).

16.     Rastegar has served as either president or chairman of MUSA since the time of its formation (Rastegar Dep., 17).  Thomas Zarem served as chief financial officer of MUSA from June 2000 to June 2007 and was responsible for procuring insurance (Zarem Dep., 13, 16; Rastegar Dep., 19).

17.     At all relevant times, MUSA operated out of offices located at 4 Testa Place in South Norwalk, CT (Zarem Dep., 15).

18.     Although the Maclaren entities owned by the Rastegar mother and sister appear to have maintained separate sets of books from MUSA, they frequently pooled resources with MUSA.  For instance, MUSA used MEL to operate as the international call center for MUSA customer service (Rastegar Dep., 170-71).  Likewise, when Tom Zarem first joined MUSA as CFO, he travelled to England about six times to assist with MEL's computer installation by performing a "needs analysis" (Zarem Dep., 149-50).

19.     As evidenced below, MUSA also served as an agent and facilitator for MEL and MHK in procuring the international insurance policies at issue.

**B.      Sahni's Role as Retail Broker for MUSA, MEL and MHK**

20.     Indebir S. Sahni, who went by the name "Rana" Sahni, operated as an independent retail broker through brokerage companies that included I.S. Sahni, Inc. and Saghner Risk Managers LLC (Lahr Decl., ¶ 7, Ex. 3, at Bates No. 151-52).

21.     At the time the cancelled policy was placed, Sahni's offices were located in New York City (Magner Dep., 17).

22.     Sahni was introduced to the Maclaren organization by none other than Farzad Rastegar, who met him at a Lamaze class when their wives were pregnant seventeen years ago (Rastegar Dep., 12).

23.     The Rastegars socialized with the Sahnis, and at one point Rastegar regarded him as a friend (Rastegar Dep., 11-12).

24.     Rastegar introduced Sahni to Zarem when he joined MUSA in 2000, and Sahni became MUSA's insurance broker (Rastegar Dep., 13-14; Zarem Dep., 27).

25.     As demonstrated below and as admitted by MEL's corporate designee, Sahni also served as the insurance broker for MEL and MHK with respect to the international liability policies at issue (Toama Dep., 154).

26.     Sahni's brokerage license was revoked by the New York Insurance Department on February 6, 2009.  According to an Insurance Department Report dated December 5, 2008, Sahni failed to remit premium payments on behalf of a client which caused its policy to be cancelled (Lahr Decl., ¶ 7, Ex. 3, Bates Nos. 5-6).  As a result of this transaction, and other discrepancies, the licenses of Sahni and his companies were revoked by an order dated February 6, 2009.  (Lahr Decl., ¶ 7, Ex. 3, Bates No. 2).

**C.      Procurement of the Initial ACE Policy in 2004**

27.     ACE was first approached about providing commercial general liability ("CGL") insurance for the Maclaren organization on March 9, 2004, when it received an email and an application from a wholesale broker named AMW Ougheltree & Associates ("Ougheltree") (Thompson Decl., ¶ 11, Ex. A).

28.     Retail brokers, such as Sahni, use wholesale brokers when they do not have direct access to particular insurers (Magner Dep., 24).

29.     The email advised that Maclaren was a stroller manufacturer "that set up separate company in USA that imported directly to USA called Maclaren USA."  The email advised that Maclaren wanted a worldwide policy that would cover "suits brought in USA for claims

occurring in USA" as well as "claims brought in foreign lands occurring in Europe." (Thompson Decl., ¶ 12, Ex. A)

30.     The application submitted with the email contained a box entitled "NAME (First Named Insured & Other Named Insureds) in which MEL was named first (as opposed to MUSA). A second box entitled "MAILING ADDRESS INCL ZIP + 4 (of First Named Insured)" was filled in with "Tom Zarem, 4 Testa Place, South Norwalk CT 08854 (Thompson Decl., ¶ 13, Ex. A). Accordingly, Maclaren's brokers designated the Connecticut address as MEL's mailing address.

31.     ACE as an insurance company does not write such global liability policies, and the ACE International Advantage Group to which the application had been submitted only writes liability coverage for overseas occurrences. (Thompson Decl., ¶ 14).

32.     Accordingly, ACE made a proposal to insure MUSA, MEL, and MHK for such foreign exposures (Thompson Decl., ¶ 15).

33.     Although MUSA was importing strollers into the United States, it stood to benefit from this coverage in the event one of its strollers was taken overseas by a purchaser and became involved in an accident involving an alleged stroller defect (Thompson Decl., ¶ 15).

34.     On March 12, 2004, ACE issued International Advantage Commercial Insurance Policy No. PHF069994 (the "2004 Policy") from its office in Wilmington, DE and mailed it to Ougheltree as the producing broker (Thompson Decl., ¶ 16, Ex. B).

35.     The 2004 Policy named MEL and MUSA as named insureds and listed "4 Testa Place, South Norwalk, CT 08854" as the mailing address pursuant to the instructions in the application (Thompson Decl., ¶ 16, Ex. B).

36.     MUSA advanced the premium payment for the 2004 Policy on behalf of MEL and MHK (Zarem Dep., 62-64, 78; Toama Dep., 144-45).

37.     MUSA then faxed an invoice to MEL on March 31, 2003, billing it for its portion of the premium (Zarem Dep., 66, 81, 164-65).

38.     Without explanation as to why, Ougheltree instructed ACE on June 29, 2004, to remove MUSA as a named insured on the 2004 Policy and to add MHK (Thompson Decl., ¶ 17).

39.     On August 23, 2004, ACE added MHK as a named insured but neglected to delete MUSA (Thompson Decl., ¶ 17).

40.     Significantly, Ougheltree issued an email on September 10, 2004, repeating its request to have MUSA removed as a named insured and attaching an ACORD Commercial Policy Change Request (Thompson Decl., ¶ 18, Ex. C).

41.     The ACORD form repeated the deletion request and in the box for the insured's name it listed MEL, while in the box designated "Insured's Mailing Address if Changed," it continued to provide the address of "4 Testa Place, Norwalk CT 06854" (Thompson Decl., ¶ 19, Ex. C).

42.     Effective September 10, 2004, ACE deleted MUSA as a named insured on the 2004 Policy and, consistent with the ACORD form, continued to list the Connecticut address as the mailing address for the Policy (Thompson Decl., ¶ 20, Ex. B).

**D.      Procurement of the 2005 ACE Policy**

43.     When the 2004 Policy came up for renewal in February 2005, Sahni and MUSA changed their wholesale broker from Ougheltree to Program Brokerage Corporation ("PBC") (Zarem Dep., 84-86, Ex. E to Toama Dep.; Magner Dep., 23-24).

44.     Tom Zarem of MUSA signed a broker of record letter to that effect on February 1, 2005.  The broker of record letter is addressed to ACE and specifically references the upcoming

renewal on March 10, 2005 of the 2004 Policy issued to MEL and MHK (Zarem Dep., 84-86, Ex. E to Toama Dep.; Magner Dep., 23-24).

45.    MUSA was acting as the agent of and facilitator for MEL and MUSA in arranging the renewal as Tom Zarem was CFO of MUSA at the time  (Zarem Dep., 84-86, Ex. E to Toama Dep.; Magner Dep., 23-24).

46.    ACE offered a renewal quote, which PBC forwarded to Sahni on March 7, 2005 (DeVito Decl., ¶ 8).

47.    Sahni then faxed to Helen Lynch of MEL on March 7, 2005, informing her of the limits of coverage for the quote, which he addressed to MEL and MHK at "4 Testa Place, South Norwalk, CT" (Toama Dep., 104, Ex. Q).  This is further evidence that Sahni was acting as the broker for MEL, and that MUSA was facilitating the placement of the coverage.

48.    On March 30, 2005, ACE issued International Advantage Policy No. PHF074674 (the "2005 Policy") to MEL and MHK from its offices in Wilmington, DE.  The 2005 Policy was mailed to PBC at its New York City address.  This Policy was issued to MEL, as the first named insured, at the Connecticut mailing address of MUSA.  (Thompson Decl., ¶ 21, Ex. D).

49.    MEL admits that it received a copy of the 2005 Policy, and never communicated verbally or in writing to PBC or ACE that it objected to the use of the Connecticut  mailing address (Lahr Decl., ¶ 9, Ex. 5, at Nos. 7-10, 15-18).

50.    By Endorsement No. 9, ACE extended the term of the 2005 Policy to April 10, 2006, for an additional premium charge of $2,763.  (Thompson Decl., ¶ 22, Ex. D).

**E.**    **Procurement of the Subject 2006 ACE Policy That Was Cancelled for Non-Payment**

51.    In an email to Mark Woollven of MEL dated February 6, 2006, Sahni asked Woollven to advance $45,000 to cover the estimated renewal premium for the foreign products

liability policy.  The funds were transferred to Sahni's account on or about February 21, 2006 (Zarem Dep., 115-16; Toama Dep., 138-39, Ex. M).

52.     This occurred before the coverage was bound and before the policy in dispute was delivered (Thompson Decl., ¶¶ 25-26; DeVito Decl., ¶¶ 8-10).

53.     On February 15, 2006, PBC submitted a renewal application to ACE for the foreign liability policy.  In the box designated "NAME (First Named Insured & Other Named Insureds)," PBC designated MEL and MHK.  In the box designated "MAILING ADDRESS INCL ZIP + 4 (of First Named Insured)," PBC listed the address "4 TEST[A] PLACE, SOUTH NORWALK, CT 06854."  (Thompson Decl., ¶¶ 23-24, Ex. E).

54.     After negotiating terms of the renewal policy with PBC, a binder was issued by ACE on April 11, 2006, for a premium of $25,311 and lower product liability limits of $2,000,000 each occurrence and in the aggregate.  (Thompson Decl., ¶¶ 25-26).

55.     On April 17, 2006, ACE issued International Advantage Commercial Insurance Policy No. PHFD36824268 (the "Subject Policy") from its offices in Wilmington, DE.  The Subject Policy was issued for the period from April 10, 2006 to April 10, 2007 (Thompson Decl., ¶ 26, Ex. F).

56.     The Subject Policy affords Commercial General Liability Coverage up to a limit of $2,000,000 each occurrence and $2,000,000 in the aggregate for products completed operations coverage (Thompson Decl., ¶ 27, Ex. F, Endorsement No. 10).

57.     The Subject Policy expressly provides that the United States is not part of the Policy's "Coverage Territory."  It also contains a US Suits Exclusion precluding coverage for suits brought in the United States (Thompson Decl., ¶ 27, Ex. F).

58.     The General Conditions of the Subject Policy include the following provision:

Conformity with Law

If any of the terms of this policy (and forms attached to it) conflict with any law of the state in which the policy is issued, the policy is amended to conform to such law.

(Thompson Decl., ¶ 27, Ex. F).

59.    The Subject Policy was mailed to PBC at its address in New York (Thompson Decl., ¶ 28).

60.    This Policy was issued to MEL as the first named insured, using the Connecticut mailing address listed in the application (Thompson Decl., ¶ 28).

61.    A notice sent with the Subject Policy advised that the premium was due to ACE thirty (30) days after the effective date of the Policy, which in this case was May 30, 2006 (Thompson Decl., ¶ 29, Ex. F).

62.    MEL admits that it received a copy of the Subject Policy, and never objected to PBC or ACE about the use of the Connecticut mailing address (Lahr Decl., ¶ 9, Ex. 5, at Nos. 11-14, 19-22, 28).

63.    Sahni sent a fax to Helen Lynch of MEL on June 19, 2006, informing her of the limits of coverage for the quote, which he addressed to MEL at MUSA's Connecticut mailing address  (Lahr Decl., ¶ 11, Ex. 7).

**F.    Cancellation of the Subject ACE Policy**

64.    The premium for the Subject Policy was not received by ACE by the May 30, 2006 deadline.  In accordance with its protocols, ACE would have contacted PBC by telephone or email to inquire about the status of payment and sent a delinquency notice to PBC  Payment was not made (Thompson Decl., ¶ 30).

65.    The provisions of the Policy pertaining to cancellation provide as follows in pertinent part:

> Either you or we can cancel this policy at any time.
>
> Your Cancellation
>
> You can cancel this policy by sending us written notice of the future date you want the coverage to end.  We will then refund on a pro rata basis any unearned portion of the premium you paid.
>
> Our Cancellation
>
> We can cancel this policy by sending to you, at your address shown in the Declarations, notice of the effective date of cancellation.  We must do this at least 90 days prior to the cancellation date, unless we are cancelling the policy because you failed to pay your premiums.  In that case, we will give you only 10 days notice.  Mailing or delivery of the notice will be proof that you were informed of the cancellation.  We will also notify any mortgagee shown in the Declarations.
>
> We will then refund on a pro rata basis any unearned portion of the premium you paid.
>
> We may refund the unearned premium at the time of cancellation, or as soon as reasonably possible after the cancellation.  However, regardless of when you receive the refund, the cancellation of the policy will take effect as explained above.

Thompson Decl., ¶ 31, Ex. F).

66.     According to these Policy provisions, ACE can effectuate a cancellation of the Policy for non-payment of premium by sending notice of the effective date of cancellation to MEL at its address shown in the Declarations (*i.e.*, the Connecticut business address of its affiliate MUSA) at least ten days before the effective date of cancellation (Thompson Decl., ¶ 32, Ex. F).

67.     The Policy further provides that, either "[m]ailing *or* delivery of the notice *will be proof* that you were informed of the cancellation."  (Emphasis added.)  According to this provision, evidence of delivery to the U.S. Postal Service establishes effective notice of cancellation to the insured (Thompson Decl., ¶ 32, Ex. F).

68.     With the premium still outstanding as of two and a half months after inception, ACE issued a Cancellation Notice dated June 27, 2006, which stated that cancellation would become effective on July 10, 2006, if the premium was not paid as of that date (Thompson Decl., ¶ 33, Ex. G).

69.     In accordance with standard business procedures at ACE, the Cancellation Notice was placed in an envelope addressed to the MEL as the first named insured and sent to the mailing address on the Subject Policy (Thompson Decl., ¶ 35, Ex. H).

70.     It was brought to the post office in Wilmington, DE where the post office issued a certificate of bulk mailing as proof of the letter's delivery into the custody of the U.S. Postal Service.  That certificate was maintained in the business records of ACE as proof of mailing of the notice (Thompson Decl., ¶ 35, Ex. H).

71.     A copy of the notice was also mailed to and received by PBC as the producer (DeVito Decl., ¶ 11).

72.     No premium payment was made by the deadline of July 10, 2006, and the Subject Policy was effectively cancelled as of that date (Thompson Decl., ¶ 36).

73.     In response to a subpoena, the bankruptcy trustee for MUSA produced records on June 11, 2012, containing the cancellation notice issued by ACE on the Subject Policy.  The records contain a notation in the handwriting of Tom Zarem of MUSA dated July 5, 2006 stating: "Phoned Rana – He's taking care of this: Firm" (Napolitano Decl., ¶ 6, Ex. 1).

74.     Although this document was not available for Zarem's deposition on April 3, 2012, he did not deny having received the notice of cancellation of the Subject Policy and stated that if he had received it, he would have sent a copy to MEL by fax and would have forwarded the original in an overnight pouch (Zarem Dep., 118-19).

**G.**     **Efforts to Collect the Earned Premium**

75.     Despite the fact that the Subject Policy was effectively cancelled for the remainder of the policy term, ACE was still owed $2,763 in earned premium for the extension of the 2005 Policy as well as $5,363.50 in earned premium for the Subject Policy for the time that it was in effect from April 10, 2006 to July 10, 2006 (Thompson Decl., ¶ 37).

76.     Accordingly, on August 30, 2006 and again on September 26, 2006, ACE sent separate notices to MEL at the Subject Policy's mailing address advising that both premiums were past due (Thompson Decl., ¶ 37, Ex. I; Zarem Dep. at 119-24).

77.     Zarem acknowledged receipt of the unpaid premium notices, and testified that he forwarded them by facsimile to Mark Woollven at MEL on October 2, 2006, with the instruction: "Please examine attached & act – per our phone talk this AM"  (Zarem Dep. at 119-23).

78.     This document is highly significant in terms of MEL's knowledge of the cancellation.  Woollven had authorized the wire transfer of the $45,000 estimated premium to Sahni back on February 17, 2006 (Zarem Dep., 115-16; Toama Dep., 138-39; Exs. T & U).  This document reveals that Sahni failed to pay the premium for the 2005 Policy extension as well as for the Subject Policy.  It further reveals that the Subject Policy was cancelled as reflected in the shortened policy period of April 10, 2006 to July 10, 2007, for which ACE was attempting to collect the earned premium.

**H.**     **Neither PBC Nor ACE Ever Received the Premium Payment**

79.     Although MEL contends that it advanced $45,000 in estimated premium payments to Sahni on February 17, 2006, neither PBC nor ACE ever received any premium payments from Sahni for the Subject Policy (Thompson Decl., ¶ 38; DeVito Decl., ¶ 12).

80.     This is further evidenced by Sahni's bank accounts for 2006, which do not reflect a payment of the premium amount (Lahr Decl, ¶ 8, Ex. 4).

81.     ACE had no commercial dealings with Rana Sahni or any of his brokerage companies in connection with the placement of the Subject Policy or any other foreign casualty insurance policy.  Likewise, ACE had no broker or agency agreements with Rana Sahni or any of his brokerage companies (Thompson Decl., ¶ 40).

82.     Finally, Sahni had no actual authority from ACE to collect the premium from MEL and MHK, nor did ACE ever confer any ostensible authority on Sahni to collect the premium (Thompson Decl., ¶ 41).

Dated:  New York, New York
   June 13, 2012

       Sedgwick LLP


       /s/ J. Gregory Lahr_____
       Joseph K. Powers (JP5504)
       J. Gregory Lahr (JL9969)
       Thomas R. Orofino (TO6171)
       125 Broad Street, 39th Floor
       New York, NY  10004-2400
       Telephone: (212) 422-0202
       Facsimile: (212) 422-0925
       *Attorneys for Defendant*
       *ACE AMERICAN INSURANCE COMPANY*