IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MACLAREN EUROPE LIMITED,

                Plaintiff,

     -against-

ACE AMERICAN INSURANCE COMPANY,
a/k/a ACE USA,

                Defendant.

Index No.: 11-cv-4688 (HB)


**DEFENDANT'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
IN FURTHER SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


Joseph K. Powers (JP 5504)
J. Gregory Lahr (JL 9969)
Thomas R. Orofino (TO 6171)
SEDGWICK LLP
125 Broad Street, 39th Floor
New York, New York 10004-2400
Telephone: (212) 422-0202
Facsimile: (212) 422-0925
*Attorneys for Defendant*
*ACE AMERICAN INSURANCE COMPANY*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ........................................................................................2

    A.    Undisputed Material Facts Relating to Choice of Law Issues................................2

    B.    Undisputed Material Facts Pertinent to Whether ACE Can Be
    Charged with Receipt of the Premium ...............................................................3

    C.    Undisputed Material Facts Pertaining to the Cancellation of
    the Policy ......................................................................................................6

LEGAL ARGUMENT ...........................................................................................11

    A.    ACE Cannot Be Charged with Receipt of the Premium Paid
    to Sahni .......................................................................................................11

    B.    ACE Properly Cancelled the Policy ...................................................................19

CONCLUSION ...................................................................................................20

NY/960083v1

<u>**TABLE OF AUTHORITIES**</u>

Page(s)

**Cases**

A.I. Credit Corp. v. Providence Washington Ins. Co., Inc.,
 No. 96-cv-7955, 1998 WL 760232 (S.D.N.Y. Oct. 29, 1998) ...................................................15

Aetna Life Ins. Co. v. Harris & Reichard Fur Dyers,
 151 Misc. 443, 270 N.Y.S. 543 (N.Y. County 1931)...................................................16

Arthurholt v. Susquehanna Mut. Fire Ins. Co. of Harrisburg,
 159 Pa. 1, 28 A. 197 (Pa. 1893)...................................................13

Bohlinger v. Zanger,
 306 N.Y. 228, 117 N.E.2d 338 (1954) ...................................................14

C&F Fishing Corp. v. Dome Ins. Co.,
 No. 81 Civ. 5474, 1984 WL 488 (S.D.N.Y. Jun. 15, 1984) ...................................................14

Commercial Union Ins. Co. v. Orbit Shipping Co.,
 107 A.D.2d 599, 483 N.Y.S.2d 709 (1st Dep't 1985)...................................................14

Guardian Life Ins. Co. v. Chemical Bank,
 94 N.Y.2d 418, 727 N.E.2d 111, 705 N.Y.S.2d 553 (2000) ...................................................15

Hobbs Brook Agency, Inc. v. North River Ins. Co.,
 7 Mass. App. Ct. 885, 386 N.E.2d 1315 (Mass. App. 1979)...................................................14

Lezak v. National Grange Mut. Ins. Co.,
 233 N.Y.S.2d 607 (N.Y. County 1962)...................................................16

Monroe County v. Hanover Ins. Co.,
 73 A.D.2d 1036, 425 N.Y.S.2d 401 (4th Dep't 1980) ...................................................13

Royal Indemnity Co. v. County of Niagara,
 67 A.D.2d 1087, 415 N.Y.S.2d 166 (4th Dep't 1979) ...................................................15

Tifco, Inc. v. American Ins. Agency of the South, Inc.,
 1991 WL 213911 (E.D. La. Oct. 11, 1991)...................................................14

**Statutes**

Fed.R.Civ.Proc. 56 ...................................................20

N.Y. Insurance Law § 2101(a) ...................................................4, 11

N.Y. Insurance Law § 2101(b) ....................................................................................4, 11

N.Y. Insurance Law § 2101(c) .............................................................................4, 12, 14

N.Y. Insurance Law § 2120(a) ........................................................................................5

N.Y. Insurance Law § 2121............................................................1, 2, 11, 13, 14, 15, 16, 17

N.Y. Insurance Law § 2122(a) ......................................................................................17

N.Y. Insurance Law § 3426............................................................................................2

**Treatises**

*MacGillivray on Insurance Law*
    7-007 (Sweet & Maxwell eds., 10th ed. 2003)................................................18, 19

Defendant, ACE American Insurance Company ("ACE"), by its attorneys, Sedgwick LLP, respectfully submits this memorandum of law in opposition to the motion of Plaintiff Maclaren Europe Limited ("MEL") for summary judgment, and in further support of ACE's motion for summary judgment seeking a declaration that the insurance policy at issue was validly cancelled for nonpayment of premium.

## PRELIMINARY STATEMENT

As more fully described in ACE's motion for summary judgment, ACE cancelled an international products liability policy for non-payment of premium which it had issued to MEL as the first named insured.  The cancellation was effective from July 10, 2006, and was issued in full compliance with the policy's cancellation provisions.  MEL contends that the cancellation was not effective under New York Insurance Law § 2121 because it had advanced an estimate of the premium payment to its *retail broker* over six weeks *before* the policy was issued by ACE.

Insurance Law § 2121 provides, in pertinent part, that: "Any insurer which delivers in this state to any insurance broker … a contract of insurance pursuant to the application or request of such broker … shall be deemed to have authorized such broker to receive on its behalf payment of any premium which is due on such contract at the time of its issuance or delivery …."

First, ACE mailed the policy to the New York *wholesale broker* who never received the premium, rather than the retail broker who apparently absconded with the premium.  The retail broker never was designated as ACE's agent for collection of the premium, and ACE had no commercial relationship with that broker.  Second, the retail broker absconded with the estimated premium *before* ACE even bound the coverage.  The retail broker received and converted the estimated premium payment from MEL before any premium was "due on such contract at the time of its issuance or delivery."  Consequently, the retail broker cannot be deemed to have acted

1

as ACE's agent for collection of the premium, and section 2121 does not apply to the facts at issue.  Third, section 2121 conflicts with English law, which has the greater interest in applying its law to the policy at issue.  English law does not charge an insurer with receipt of premium payments that that been converted by a broker who has not been designated as the insurer's agent for collection of that premium.

MEL also contends that the cancellation is governed by New York Insurance Law § 3426, which purportedly trumps the cancellation provisions in ACE's policy.  For the reasons set forth in ACE's moving brief, which are incorporated by reference into its opposition, England has the greatest interest in applying its law to the cancellation of the policy, and England enforces such provisions as a matter of contract law.  Further, the provisions in the policy do not "conflict" with New York law, whose cancellation statute does not apply to an international products liability policy issued to a foreign insured and covering foreign occurrences.

## STATEMENT OF FACTS

**A.**     **Undisputed Material Facts Relating to Choice of Law Issues**

MEL is an English corporation with its primary place of business in Northhamptonshire, England (MEL Rule 56.1 Statement, ¶ 1).  MEL sells Maclaren baby strollers throughout Europe under a licensing agreement with Maclaren Hong Kong ("MHK"), which manufactures the strollers (MEL Brief, p. 1).

The 2006 ACE Policy provides coverage worldwide, excluding the United States (MEL Brief, p. 2).  MEL is the first named insured on the 2006 Policy (Policy, Endorsement No. 2 [Named Insured]).  The General Conditions of the Policy "apply to the entire policy" and include the following provision:

*Sole Agent*

If more than one person or organization is insured under this policy, the first one named in the Declarations will act on behalf of all others.

[Policy, Common Policy Conditions, p. 1 of 3].

**B.      Undisputed Material Facts Pertinent to Whether ACE Can Be Charged with Receipt of the Premium**

The material facts as they relate to whether ACE can be charged with receipt of the premium for the 2006 Policy by virtue of MEL's *estimated* premium payment of $45,000 to its retail insurance broker on February 22, 2006, are substantially undisputed.  ACE agrees with MEL's contentions that Indebir Sahni (a/k/a Rana Sahni) was an insurance broker doing business in New York who operated as an insurance broker through his companies I.S. Sahni Inc. ("I.S. Sahni") and Sahgner Risk Managers LLC ("Sahgner"), which were based in New York  (MEL Rule 56.1 Statement, ¶¶ 2-4).  ACE also agrees that Sahni acted as MEL's retail broker and agent in connection with the placement of the 2006 Policy, which was cancelled for non-payment of premium (MEL Rule 56.1 Statement, ¶¶ 14, 18).

ACE also agrees with MEL's characterization of the relationship between Sahni and Program Brokerage Corporation ("PBC").  Sahni did not contact ACE for a quote himself, but rather sought a quote through PBC, acting as a wholesale or sub-broker (MEL Brief, p. 2; MEL Rule 56.1 Statement, ¶ 15).  ACE agrees that it is a common practice in the insurance industry for brokers (also known as "producers") to use other brokers as their agents in seeking insurance for their customers and in such instances, the broker with whom the insured deals is known in industry parlance as the retail broker.  On the other hand, the other brokers in the chain between the retail broker and the insurer are known as sub-brokers or wholesale brokers (MEL Brief, p. 2).

MEL does not contend, and there is no basis for inferring, that PBC acted as an "insurance agent" or "independent insurance agent" within the meaning of Insurance Law § 2101(a) and (b).  ACE and PBC have submitted evidence confirming that such relationships did not exist between ACE and PBC with respect to the placement of the 2006 Policy (DeVito Declaration dated June 22, 2012 ("DeVito Oppos. Decl."), ¶¶ 14-15; Thompson Declaration dated June 25, 2012 ("Thompson Oppos. Decl."), ¶¶ 3-4).  Instead, PBC's role was that of an "insurance broker" within the contemplation of Insurance Law § 2101(c), as one who "acts or aides in … placing risks or taking out insurance … on behalf of any licensed insurance broker" (*i.e.*, Sahni).

ACE does not dispute that, as the 2005 Policy was nearing expiration, Sahni requested that MEL wire $45,000 in estimated premium for a renewal policy because the 2005 Policy was due to expire on March 10, 2006 (MEL Brief, p. 4; MEL Rule 56.1 Statement, ¶ 20).  ACE also concedes that MEL wired $45,000 to Sahgner on February 22, 2006, and the records from Sahni's bank show that the wire transfer from MEL was received at Sahgner's checking account the same day (MEL Rule 56.1 Statement, ¶ 19; MEL Brief, p. 5).

What ACE vigorously disputes is MEL's suggestion that the money was sent for the renewal of the 2006 ACE Policy, and that Sahni was holding the funds in the capacity of an agent of ACE for the collection of a premium that had not even been quoted by ACE at that point in time (MEL Rule 56.1 Statement, ¶ 20).

In fact, the only action taken on obtaining renewal coverage from ACE at the time of the February 22, 2006 wire transfer of the "estimated" premium was that PBC had submitted a renewal application to ACE on February 15, 2006, which ACE did not respond to in terms of offering a renewal quote until March 7, 2006.  The quote offered per "occurrence" limits of

4

$2,000,000 which were lower than the limits on the expiring policy (DeVito Decl. of 6/13/12, ¶¶ 7-8, Exs. C & D).  On March 8, 2006, ACE offered a renewal quote offering $5,000,000 per occurrence limits at a premium of $50,311, which MEL found to be significantly higher than the prior year's premium (MEL Brief, p. 5).  Between March 8, 2006 and April 10, 2006, PBC was instructed to obtain quotes on the insurance from other insurers and did so (DeVito Oppos. Decl. ¶¶ 10-13, Exs. C, E, F, G, H).  It was not until April 10, 2006, after PBC failed to obtain quotes from other insurers for more competitive rates, that a broker in Sahni's office authorized PBC to bind the coverage for the 2006 renewal based on the terms provided in ACE's quote of March 8, 2006, offering reduced limits of $2,000,000 per occurrence at a premium of $25,311 (DeVito Oppos. Decl. ¶¶ 4-13, Ex. H; MEL Brief, p. 5).  A binder was issued by ACE on April 11, 2006, and the 2006 Policy was issued on April 17, 2006, when it was mailed from ACE's offices in Wilmington, Delaware to PBC's offices in New York (Thompson Decl. of 6/13/12, ¶¶ 25,26, 28).

Between February 22, 2006, and the issuance of the Policy on April 10, 2006, MEL's $45,000 in estimated premium payments had completely dissipated from Sahni's business checking accounts.  MEL contends that it wired $45,000 to Sahgner's checking account on February 22, 2006 (MEL Rule 56.1 Statement, ¶ 19; Hugel Decl., Ex. L & M).  This credit (for a net amount of $44,971.00) is reflected in Sahgner's checking account statement dated February 28, 2006 (Lahr Declaration dated June 25, 2012 ("Lahr Oppos. Decl."), Ex. A).

Despite his fiduciary obligations under Insurance Law § 2120(a) not to mingle funds collected as an insurance broker with his own funds or funds held by him in any other capacity, Sahni depleted the Saghner checking account by February 27, 2006 – at which time it had a balance of $6,190.62 (Lahr Oppos. Decl., Ex. A).  By March 24, 2006, the balance had been

5

reduced to $91.97 (Lahr Oppos. Decl., Ex. B).  Saghner's checking account records for February 2006 also show that on February 24, 2006 – two days after the wire transfer – $35,000 was transferred from the Saghner checking account to account number 007910026405 (Lahr Oppos. Decl., Exs. A, C).  That account is in the name of I.S. Sahni Inc. Fiduciary Account (Lahr Oppos. Decl., Ex. C).  The February 2006 account statement for the Sahni checking account reflects the fact that the account was overdrawn by $33,547.07 on February 23, 2006, and that following the $35,000 transfer on February 24, 2006, it remained overdrawn on February 24th by $2,297.38 (Lahr Oppos. Decl., Ex. C).  Accordingly, the money that MEL had advanced to Sahni as estimated premium had been converted by him long before ACE bound the coverage on the 2006 Policy.

MEL has stated that it has no reason to dispute the contentions by ACE and PBC that Sahni did not remit to them any portion of the 2006 renewal premium paid by MEL (MEL Brief, p. 6).  What it fails to acknowledge is that Sahni had disbursed its funds in breach of his fiduciary duties long before ACE agreed to the issuance of the 2006 Policy.

**C.    Undisputed Material Facts Pertaining to the Cancellation of the Policy**

MEL and MHK have common ownership (MEL Brief, p. 1).  Although MEL and MUSA had no common ownership, two of MUSA's owners were blood relatives of MEL's owners (MEL Brief, p. 1).  MEL and MUSA were in the same business – MEL sold Maclaren baby strollers in Europe and MUSA sold the same strollers in the United States (MEL Brief, p. 1).  As the companies had similar insurance needs and shared family bonds among their owners, they decided to explore the possibility of obtaining a single global liability insurance policy for all three companies (MEL Brief, pp. 1-2).

ACE was first approached about providing commercial general liability ("CGL") insurance for the Maclaren organization on March 9, 2004, when it received an email and an

6

application from a wholesale broker named AMW Ougheltree & Associates ("Ougheltree") (Thompson Decl. of 6/13/12, ¶ 11, Ex. A).  The application submitted with the email contained a box entitled "NAME (First Named Insured & Other Named Insureds)" in which MEL was named first (as opposed to MUSA).  A second box entitled "MAILING ADDRESS INCL ZIP + 4 (of First Named Insured)" was filled in with "Tom Zarem, 4 Testa Place, South Norwalk CT 08854" (Thompson Decl. of 6/13/12, ¶¶ 12-13, Ex. A).  Accordingly, Maclaren's brokers were the ones who initially designated the Connecticut address as MEL's mailing address.

On September 10, 2004, Ougheltree issued an email to ACE requesting that MUSA be removed as a named insured, and attached an ACORD Commercial Policy Change Request (Thompson Decl. of 6/13/12, ¶ 18, Ex. C).  The ACORD form repeated the deletion request and in the box for the insured's name it listed MEL, while in the box designated "Insured's Mailing Address if Changed," it continued to provide the address of "4 Testa Place, Norwalk CT 06854" (Thompson Decl. of 6/13/12, ¶ 19, Ex. C).  Effective September 10, 2004, ACE deleted MUSA as a named insured on the 2004 Policy and, consistent with the ACORD form, continued to list the Connecticut address as the mailing address for the Policy (Thompson Decl. of 6/13/12, ¶ 20, Ex. B).

The fact that the Connecticut address was left on the policies as the mailing address for MEL was not due to the process of "shuffling and re-shuffling the list of named insureds" as suggested by MEL (MEL Brief, p. 3).  Ougheltree had been told that "the first named insured must have a U.S. address" (Thompson Dep., pp. 68-69, Ex. 11; MEL Brief, p. 3).  On February 15, 2006, PBC submitted a renewal application to ACE for the 2006 Policy.  In the box designated "NAME (First Named Insured & Other Named Insureds)," PBC designated MEL and MHK.  In the box designated "MAILING ADDRESS INCL ZIP + 4 (of First Named Insured),"

7

PBC listed the address "4 TEST[A] PLACE, SOUTH NORWALK, CT 06854."  (Thompson Decl. of 6/13/12, ¶¶ 23-24, Ex. E).

After negotiating terms of the renewal policy with PBC, a binder was issued by ACE on April 11, 2006, for a premium of $25,311.   On April 17, 2006, ACE issued International Advantage Commercial Insurance Policy No. PHFD36824268 (the "Subject Policy") from its offices in Wilmington, DE.  The Subject Policy was issued for the period from April 10, 2006 to April 10, 2007.  The Subject Policy afforded Commercial General Liability Coverage up to a limit of $2,000,000 each occurrence and $2,000,000 in the aggregate for products completed operations coverage.  (Thompson Decl. of 6/13/12, ¶¶ 25-27, Ex. F, End. No. 10).  The Subject Policy expressly provided that the United States was not part of the Policy's "Coverage Territory."  It also contained a U.S. Suits Exclusion precluding coverage for suits brought in the United States (Thompson Decl. of 6/13/12, ¶ 27, Ex. F, End. No. 6).  The General Conditions of the Subject Policy include the following provision:

> *Conformity with Law*
>
> If any of the terms of this policy (and forms attached to it) conflict with any law of the state in which the policy is issued, the policy is amended to conform to such law.

(Thompson Decl. of 6/13/12, ¶ 27, Ex. F).

The Subject Policy was mailed to PBC at its address in New York.  This Policy was issued to MEL as the first named insured, using the Connecticut mailing address listed in the application.  A notice sent with the Subject Policy advised that the premium was due to ACE thirty (30) days after the effective date of the Policy, which in this case was May 30, 2006 (Thompson Decl. of 6/13/12, ¶ 29, Ex. F).  MEL admits that it received a copy of the Subject

Policy, and never objected to PBC or ACE about the use of the Connecticut mailing address (Lahr Decl. of 6/13/12, ¶ 9, Ex. 5, at Nos. 11-14, 19-22, 28).

The premium for the Subject Policy was not received by ACE by the May 30, 2006 deadline.  In accordance with its protocols, ACE would have contacted PBC by telephone or email to inquire about the status of payment and sent a delinquency notice to PBC.  Payment was not made (Thompson Decl. of 6/13/12, ¶ 30).

The provisions of the Policy pertaining to cancellation provide as follows in pertinent part:

> Either you or we can cancel this policy at any time.
>
> *Your Cancellation*
>
> You can cancel this policy by sending us written notice of the future date you want the coverage to end.  We will then refund on a pro rata basis any unearned portion of the premium you paid.
>
> *Our Cancellation*
>
> We can cancel this policy by sending to you, at your address shown in the Declarations, notice of the effective date of cancellation.  We must do this at least 90 days prior to the cancellation date, unless we are cancelling the policy because you failed to pay your premiums.  In that case, we will give you only 10 days notice.  Mailing or delivery of the notice will be proof that you were informed of the cancellation.  We will also notify any mortgagee shown in the Declarations.
>
> We will then refund on a pro rata basis any unearned portion of the premium you paid.
>
> We may refund the unearned premium at the time of cancellation, or as soon as reasonably possible after the cancellation.  However, regardless of when you receive the refund, the cancellation of the policy will take effect as explained above.

(Thompson Decl. of 6/13/12, ¶ 31, Ex. F).

9

According to these Policy provisions, ACE can effectuate a cancellation of the Policy for non-payment of premium by sending notice of the effective date of cancellation to MEL at its address shown in the Declarations (*i.e.*, the Connecticut business address of its affiliate MUSA) at least ten days before the effective date of cancellation.  The Policy further provides that, either "[m]ailing *or* delivery of the notice *will be proof* that you were informed of the cancellation." (Emphasis added).  According to this provision, evidence of delivery to the U.S. Postal Service establishes effective notice of cancellation to the insured (Thompson Decl. of 6/13/12, ¶ 32, Ex. F).

With the premium still outstanding as of two and a half months after inception, ACE issued a Cancellation Notice dated June 27, 2006, which stated that cancellation would become effective on July 10, 2006, if the premium was not paid as of that date (Thompson Decl. of 6/13/12, ¶ 33, Ex. G).  In accordance with standard business procedures at ACE, the Cancellation Notice was placed in an envelope addressed to MEL as the first named insured and sent to the mailing address on the Subject Policy.  It was brought to the post office in Wilmington, DE where the post office issued a certificate of bulk mailing as proof of the letter's delivery into the custody of the U.S. Postal Service.  That certificate was maintained in the business records of ACE as proof of mailing of the notice (Thompson Decl. of 6/13/12, ¶ 35, Ex. H).  A copy of the notice was also mailed to and received by PBC as the producer (DeVito Decl. of 6/13/12, ¶ 11).  No premium payment was made by the deadline of July 10, 2006, and the Subject Policy was effectively cancelled as of that date (Thompson Decl. of 6/13/12, ¶ 36).

In response to a subpoena, the bankruptcy trustee for MUSA produced records on June 11, 2012, containing the cancellation notice issued by ACE on the Subject Policy.  The records contain a notation in the handwriting of Tom Zarem of MUSA dated July 5, 2006 stating:

10

"Phoned Rana – He's taking care of this: Firm" (Napolitano Decl., ¶ 6, Ex. 1).  Although this document was not available for Zarem's deposition on April 3, 2012, he did not deny having received the notice of cancellation of the Subject Policy and stated that if he had received it, he would have sent a copy to MEL by fax and would have forwarded the original in an overnight pouch (Zarem Dep., 118-19).

## LEGAL ARGUMENT

### A.    ACE Cannot Be Charged with Receipt of the Premium Paid to Sahni

MEL contends that the cancellation of the coverage by ACE was ineffective based on New York Insurance Law § 2121, which provides that:

> Any insurer which delivers in this state to any insurance broker or any insured represented by such broker a contract of insurance pursuant to the application or request of such broker, acting for an insured other than himself, shall be deemed to have authorized such broker to receive on its behalf payment of any premium which is due on such contract at the time of its issuance or delivery or payment of any installment of such premium or any additional premium which becomes due or payable thereafter on such contract, provided such payment is received by such broker within ninety days after the due date of such premium or installment thereof or after the date of delivery of a statement by the insurer of such additional premium.

MEL's argument fails to recognize the distinction between insurance brokers, insurance agents, and independent insurance agents in terms of the operation of this statute.  Insurance Law § 2101 (a) defines "insurance agent," in pertinent part, as "any authorized or acknowledged agent of an insurer … who acts as such in the solicitation of, negotiation for, or sale of insurance." There is no allegation or evidence that PBC or Sahni acted as an insurance agent for ACE (Thompson Oppos. Decl., ¶¶ 3-4; DeVito Oppos. Decl., ¶¶ 14-15).

In contrast, the term "independent insurance agent" is defined under Insurance Law § 2101(b), in pertinent part, as "an 'insurance agent' who is not owned or controlled by any insurer … and whose agency agreement does not prohibit the representation of other insurers or

groups of insurers." Here, Sahni had no agency agreement with ACE or any other commercial relationship (Thompson Decl. of 6/13/12, ¶ 39-41; Thompson Oppos. Decl., ¶¶ 3-4). Likewise, although PBC had an agency agreement with certain ACE affiliates, it had no such agency agreement with ACE (DeVito Oppos. Decl., ¶¶ 4, 14-15; Thompson Oppos Decl, ¶¶3-4). Consequently, neither PBC nor Sahni were "independent insurance agents" of ACE. Finally, Insurance Law § 2101(c) defines "insurance broker," in pertinent part, as "any person, firm, association or corporation who or which for any compensation, commission or other thing of value acts or aids in any manner in soliciting, negotiating or selling, any insurance … or in placing risks or taking out insurance, on behalf of an insured … or on behalf of any licensed insurance broker." Here, both Sahni and PBC acted solely as "insurance brokers" in placing the 2006 Policy.

It is important to recognize the distinction between an "agent" and a "broker" in terms of the application of the statute. For the statute to apply to the facts at issue, the insurer must "deliver[ ] in this state to any insurance broker … a contract of insurance pursuant to the application or request of such broker, acting for an insured." It is only then that the insurer "shall be deemed to have authorized such broker to receive on its behalf payment of any premium which is due on such contract at the time of its issuance or delivery." What MEL fails to recognize in many of the cases and authorities it cites in its brief, is that an "agent" is treated as the equivalent of the insurer in the application of the statute. For instance, in the New York Advisory Opinion cited by MEL, the hypothetical situation was as follows:

> An insurance broker, on behalf of his client, the insured, placed insurance *through an agent of the insurer*. Subsequently, insurer submitted a notice of non-payment to the insured and the broker. The broker accepted the premium payment prior to the effective date of cancellation but he neglected to transmit such payment to

> the insurer or its agent.   The insurer claimed the policy was
> terminated for non-payment.

(Hugel Decl., Ex. Y) (emphasis added).

This is not a hypothetical involving a retail broker who converts the premium before the policy is issued to a wholesale broker.   It is in this context that the Advisory Opinion states that the "Department has long held the position that the insurer must accept that payment of premiums to a broker is equivalent to receipt by the insurer, even though the insurer had no direct dealings with such broker" (Hugel Decl., Ex. Y).   Accordingly, in <u>Arthurholt v. Susquehanna Mut. Fire Ins. Co. of Harrisburg</u>, 159 Pa. 1, 28 A. 197 (Pa. 1893), a case cited by MEL, the insurer was charged with receipt of premiums that had been absconded by a broker where the policy had been delivered to the broker by an agent of the insurer.

Here, ACE delivered the 2006 Policy to PBC and not to Sahni.   As noted above, for section 2121 to apply, the insurer must "deliver[ ] in this state to any insurance broker … a contract of insurance pursuant to the application or request of such broker, acting for an insured." It is only then that the insurer "shall be deemed to have authorized *such broker* to receive on its behalf payment of any premium which is due on such contract at the time of its issuance or delivery." (Emphasis added).   MEL concedes that PBC never received the premium and, therefore, the statute has no application.

When an insurance agent such as Sahni is acting as a broker in placing insurance with a company that he does not represent, he acts as the agent of the insured and not of the insurer with respect to his handling of premium payments.   <u>Monroe County v. Hanover Ins. Co.</u>, 73 A.D.2d 1036, 1037, 425 N.Y.S.2d 401 (4th Dep't 1980).   It is only where an "insurer delivers a policy to an insurance broker [that the] insurer makes the broker its agent for receipt of premium payments." <u>C&F Fishing Corp. v. Dome Ins. Co.</u>, No. 81 Civ. 5474, 1984 WL 488, *2

13

(S.D.N.Y. Jun. 15, 1984).  "Section 121 [predecessor to § 2121] makes payment of a premium to an authorized broker, to whom the insurer has delivered the policy, equivalent to payment to the insurer."  Commercial Union Ins. Co. v. Orbit Shipping Co., 107 A.D.2d 599, 710-11, 483 N.Y.S.2d 709 (1st Dep't 1985).  Because the Subject Policy was delivered to PBC, only PBC can be deemed to be the agent of ACE for purposes of collection of premium under the statute.  As PBC never received payment, the statute does not apply.

MEL cites to the dissenting opinion in Bohlinger v. Zanger, 306 N.Y. 228, 117 N.E.2d 338 (1954) for the proposition that that an insurer is chargeable with the payment of premium to any broker in a chain of brokers involved in placing a policy.  What it fails to note is the holding of the majority of the Court which found as follows:

> It is a well-settled principle of common law that an insurance broker, when acting for an insured, is deemed the agent of the insured, which principal is now embodied in … statute [now Insurance Law § 2101(c)] and at the same time the broker has authority to receive premiums on behalf of the insurer [now Insurance Law § 2121]. …
>
> *           *           *
>
> Had the legislature intended to treat all premium monies in the hands of a broker as belonging to the company, it is reasonable to assume that it would have said so in more particular language.

Id., 306 N.Y. at 232.

The limitations on the statute requiring that the insurer or its agent must deliver the policy to the broker who absconded with the premium before the insurer would be charged with receipt of the premium were lost on the Massachusetts court that misconstrued section 2121 in Hobbs Brook Agency, Inc. v. North River Ins. Co., 7 Mass. App. Ct. 885, 386 N.E.2d 1315 (Mass. App. 1979).  A Louisiana case cited by MEL entitled Tifco, Inc. v. American Ins. Agency of the South, Inc., 1991 WL 213911 (E.D. La. Oct. 11, 1991) is of no import because the Louisiana

14

statute imputing premium payments to a broker as payments to the insurer, does not limit the presumption of payment to circumstances where the insurer has delivered the policy to the absconding broker.

Even if the Court were to find that the statute applies to a retail broker such as Sahni who absconds with the insured's premium, ACE cannot possibly be charged with having designated Sahni as its agent for the collection of premium where the premium is absconded before the policy is issued or delivered.  Section 2121 states that where an insurer delivers a policy to a qualifying broker, the insurer "shall be deemed to have authorized such broker to receive on its behalf payment of any *premium which is due on such contract at the time of its issuance or delivery.*"  (Emphasis added).  This portion of the statute is clearly grounded on agency principles which recognize that a broker cannot act as agent of the insurer for collection of premium *before* there is any right to collect premium.  See Guardian Life Ins. Co. v. Chemical Bank, 94 N.Y.2d 418, 423, 727 N.E.2d 111, 115, 705 N.Y.S.2d 553, 557 (2000) ("[E]ven in the absence of a contract provision, where an insurer has authorized an insurance broker to collect premiums, the broker acts as the agent of the insurer in doing so.").

In A.I. Credit Corp. v. Providence Washington Ins. Co., Inc., No. 96-cv-7955, 1998 WL 760232, *7 (S.D.N.Y. Oct. 29, 1998), the court found that "an insurance broker is solely in privity with the customer insured and not with the insurer until the insurer impliedly consents to the broker's collection of the premium by delivering the policy to the broker."  Because the broker was deemed to have absconded with the premium prior to the delivery of the policies at issue, the statute was found to be inapplicable.  Id.  See also Royal Indemnity Co. v. County of Niagara, 67 A.D.2d 1087, 415 N.Y.S.2d 166 (4th Dep't 1979) (Section 2121 "clearly does not cover overpayments of premiums or payments of premiums prior to their due date . . . .")

As stated in <u>Lezak v. National Grange Mut. Ins. Co.</u>, 233 N.Y.S.2d 607, 609 (N.Y. County 1962):

> The authority of the broker to act in his dual capacity, under [Insurance Law § 2121], extends only to the period in which the policy remains in force and after its delivery to him.  It necessarily excludes the period between which the broker is engaged by the prospective insured to secure a policy of insurance and the receipt of the policy from the insurer by the broker.  During this interval, he is in privity solely with his customer and does not establish any privity with any insurance company until the latter impliedly consents to his collection of the premium by delivering the policy of insurance to him.

<u>See also</u> <u>Aetna Life Ins. Co. v. Harris & Reichard Fur Dyers</u>, 151 Misc. 443, 444, 270 N.Y.S. 543 (N.Y. County 1931) (where broker absconds with premium in excess of amount then due, "he was not acting as the agent of the insurers and consequently, any such excess payment made to the broker does not constitute of any amount thereafter to become due to the insurers").

Here, between February 22, 2006, and the issuance of the Policy on April 10, 2006, MEL's $45,000 in estimated premium payments had completely dissipated from Sahni's business checking accounts.  ACE does not dispute that MEL wired approximately $45,000 to Sahgner's checking account on February 22, 2006 (MEL Rule 56.1 Statement, ¶ 19; Hugel Decl., Ex. L & M).  This credit (for a net amount of $44,971.00) is reflected in Sahgner's checking account statement dated February 28, 2006 (Lahr Oppos. Decl., Ex. A).

Nonetheless, Sahni depleted the Saghner checking account by February 27, 2006 – at which time it had a balance of $6,190.62 (Lahr Oppos. Decl., Ex. A).  By March 24, 2006, the balance had been reduced to $91.97 (Lahr Oppos. Decl., Ex. B).  Saghner's checking account records for February 2006 reflect the fact that on February 24, 2006 – two days after the wire transfer – $35,000 was transferred from the Saghner checking account to account number 007910026405 (Lahr Oppos. Decl., Exs. A, C).  That account is in the name of I.S. Sahni Inc.

Fiduciary Account (Lahr Oppos. Decl., Ex. C).  The February 2006 account statement for the Sahni checking account reflect the fact that the account was overdrawn by $33,547.07 on February 23, 2006 (the day before the transfer), and that following the $35,000 transfer on February 24, 2006, the Sahni account remained overdrawn on February 24th by $2,297.38 (Lahr Oppos. Decl., Ex. C).  Accordingly, the money that MEL had advanced to Sahni as estimated premium had been converted by him long before ACE bound the coverage on the 2006 Policy.

Under Insurance Law § 2122(a), "every insurance broker acting as such in this state shall be responsible in a fiduciary capacity for all funds received or collected as … insurance broker, and shall not, without the express consent of his or its principal, mingle any such funds with his or its own funds or with funds held by him or in any other capacity."  Sahni's bank records clearly demonstrate that the funds that had been transferred to his account by MEL had been dissipated long before the 2006 Policy had been issued by ACE (Lahr Oppos. Decl., Exs. A-C).  Because Sahni received the premium advance from MEL at a time when he could not be regarded as an agent of ACE for collection of premiums, and had absconded with the proceeds before the 2006 Policy was issued and delivered, the statute has no applicability.  In fact, the conversion of the premium was completed during a period when Sahni and PBC were actively "shopping" the risk to other insurers (DeVito Oppos. Decl., ¶¶ 4-13).

Even if the Court were to find that Insurance Law § 2121 potentially applied to this matter, the Court would be required to look to English law to determine if a conflict of law exists, and then to resolve that conflict through application of New York's choice of law principles.  As set forth in ACE's motion for summary judgment, there is a clear conflict in the law of New York compared to English law with respect to the imputation of premium payments

to an insurer where the broker who has failed to remit the premium to the insurer has not been designated by the insurer as its agent for collection of the premium.

Under English law, "Prima facie, a broker employed by the assured to effect an insurance has no authority from the company to collect the premium for it, so that payment to him is not necessarily payment to the company." *MacGillivray on Insurance Law* 7-007 (Sweet & Maxwell eds., 10th ed. 2003). Further, "[a]s the broker is the assured's agent, it follows that where the assured pays the premium to the broker, the insurer cannot be treated as having received it." Id. at 8-007. In situations where "the assured [has] paid the premium to his broker … [t]he ordinary rule … is that the broker is the agent of the assured, so that such payment is in law one by the assured to himself. This position will be varied where it can be shown that the broker had actual or ostensible authority conferred upon him by the insurer in respect of the receipt of the premium." Id. at 8-003. Furthermore, "[i]f the assured has paid the premium to a duly authorized agent of the insurer it will be prima facie deemed to have been received by insurer." Id.

Here, Sahni was retained as the retail broker for MEL and MHK in connection with the placement of the 2006 Policy. Sahni had no contractual agreements with ACE in connection with that placement, nor did it ever deal directly with ACE in obtaining the coverage. (Thompson Decl. of 6/13/12, ¶¶ 40-41). Instead, Sahni employed the services of PBC, as a wholesale broker, to place the Subject Policy. Sahni had no actual authority from ACE to collect the premium from MEL and MHK, nor did ACE ever confer any ostensible authority on Sahni to collect the premium. (Thompson Decl. of 6/13/12, ¶ 41). It is only "[w]here the insurer has authorized an agent or broker to accept the premium on its behalf [that] such premium discharges the assured's obligations toward the insurer." *MacGillivray on Insurance Law* 8-003. Instead,

MEL advanced an estimated premium to Sahni as its retail broker prior to any quote, binder or delivery of the Policy by ACE, and the money was dissipated.  (Thompson Decl. of 6/13/12, ¶ 38, DeVito Decl. of 6/13/12, ¶ 12).   The premium was never forwarded to PBC, as the producing broker, or to ACE, as the insurer (MEL Brief, pp. 5-6).

Although ACE does not permit direct payment of premiums by insureds on its international policies and requires that payment be made through PBC, it never authorized Sahni to collect the premium on its behalf (Thompson Decl. of 6/13/12, ¶ 41).  Thus, while PBC may qualify as the agent of ACE for collection of premiums, "[a]n agent is not entitled to delegate his authority without the express or implied consent of his principal and, therefore, where an insurance company appoints a particular person to receive the premiums, that person cannot appoint anyone else to receive them on his behalf, unless authorized by the company to do so." *MacGillivray on Insurance Law*, supra, 7-005.  Accordingly, under English law, the payment of the estimated premium to Sahni cannot be deemed to be a payment to ACE.

For the reasons advanced in ACE's motion for summary judgment, England has the paramount interest in applying its law to this issue because MEL is an English company and the claims at issue during the cancellation period all arose in Europe.

**B.**     **ACE Properly Cancelled the Policy**

ACE stands on the arguments raised in its moving brief as to the reasons why its cancellation of the 2006 Policy was legally effective.  As to MEL's argument that China has an equal interest in applying its law to the interpretation of the Policy, the Court should note that MEL is the first named insured on the Policy and, as such, is designated to act as the sole agent for all other insureds who are covered by the Policy (Policy, Endorsement No. 2 [Named Insured]; Policy, General Conditions [Sole Agent], p. 1 of 3).  In addition, MEL is the only insured involved in the underlying claims (Complaint, ¶ 8).

19

## <u>CONCLUSION</u>

For all of the above reasons, as well as those set forth in ACE's motion for summary judgment, ACE American Insurance Company respectfully requests that this Court enter an order pursuant to Fed.R.Civ.Proc. 56: (a) dismissing with prejudice Plaintiff's Complaint in its entirety; (b) declaring that the Subject Policy was validly cancelled with effect from July 10, 2006; and (c) awarding such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         June 25, 2012


                    SEDGWICK LLP


                    /s/ J. Gregory Lahr
                    Joseph K. Powers (JP5504)
                    J. Gregory Lahr (JL9969)
                    Thomas R. Orofino (TO6171)
                    125 Broad Street, 39th Floor
                    New York, New York 10004-2400
                    Telephone: (212) 422-0202
                    Facsimile: (212) 422-0925

                    *Attorneys for Defendant*
                    *ACE AMERICAN INSURANCE COMPANY*

20

NY/960083v1