UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
MACLAREN EUROPE LIMITED,                          :
                                                  :
                              Plaintiff,          :
                                                  :  INDEX No. 11 cv 4688 (HB)
            -against-                             :
                                                  :
ACE AMERICAN INSURANCE COMPANY,                   :
a/k/a ACE USA,                                    :
                                                  :
                              Defendant.          :
----------------------------------------------------------x


**REPLY MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**


Of Counsel,                          CLAYMAN & ROSENBERG LLP
Paul S. Hugel (PH4749)               ATTORNEYS FOR PLAINTIFF
                                     305 Madison Avenue - Suite 1301
                                     New York, New York 10165
                                     (212) 922-1080  phone
                                     (212) 949-8255  facsimile

# TABLE OF CONTENTS

REPLY/OPPOSITION FACTUAL BACKGROUND ........................................................................ 1

REPLY/OPPOSITION ARGUMENT .............................................................................................. 2

    **I.**    **NEW YORK INSURANCE LAW SECTION 2121**
           **GOVERNS THE PAYMENT OF PREMIUM BY MEL TO SAHNI** ................................ **2**

           A.    New York Insurance Law § 2121
                  Governs Sahni's Authority to Collect Premium .................................... 4

           B.    Insurance Law § 2121 Applies to Sahni
                  Even Though He did Not Deal Directly With ACE ................................ 5

           C.    Mel's Payment of the Renewal Premium to
                  Sahni Prior to Insurance of the Renewal
                  is Protected Under Insurance Law § 2121 ............................................. 8

    **II.**    **THE POLICY IS GOVERNED BY NEW YORK LAW** ................................................. **14**

CONCLUSION .............................................................................................................................. 19

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                    <u>Page(s)</u>

*18th Ave. Realty Corp. v. Aetna Cas. & Sur. Co.,*
    240 A.D.2d 287 N.Y.S.2d 17(1997) ......................................................................12

*A.I. Credit Corp. v. Providence Washington Ins. Co.,*
    96-cv-7955, 1998 WL 760232 (S.D.N.Y. 1998) ...................................................12

*Augustin v. Gilot,*
    152 Misc. 2d 666, N.Y.S2d 348 (Civ.Ct.1991)
    *rev's on other grounds, 158 Misc. 2d 627 N.Y.S.2d 514 (App. Term 1993)*..........10

*Brentwood Pain & Rehab. Services, P.C. v. Allstate Ins. Co.,*
    508 F. Supp. 2d 278, 291 (S.D.N.Y. 2007).......................................................6,13

*Bruckner Plaza Associates v. Generali Ins. Co. of Trieste & Venice,*
    U.S. Branch, 172 A.D.2d 408 N.Y.S.2d 786 (1991) ..............................................14

*Bohlinger v. Zanger,*
    306 N.Y. 228 117 N.E.2d 338 (1954)............................................................4, 8, 9

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.,*
    629 F.2d 786, 794 (2d Cir. 1980)............................................................................5

*C & F Fishing Corp. v. Dome Insurance Co.,*
    81 CIV. 5474 (PNL), 1984 WL 488 (S.D.N.Y. June 15, 1984) ...........................12

*Evvtex Co. v. Hartley Cooper Assocs.,*
    911 F. Supp. 732 (S.D.N.Y. 1996) ........................................................................9

*Fieger v. Pitney Bowes Credit Corp.,*
    251 F.3d. 386 (2d Cir. 2001)..................................................................................5

*Gen Fire & Cas. Co. v. Mackpat Corp.,*
    33 A.D.2d 765 N.Y.S.2d 314 (1st Dept. 1969) ...............................................10, 13

*Gerling Am. Ins. Co. v. Steadfast Ins. Co.,*
    00 CIV. 7907 (HB), 2001 WL 936288 (S.D.N.Y. Aug. 17, 2001)................15, 16

*Greater New York Mut. Ins. Co. v. Axentiou,*
    193 A.D. 2d 474 N.Y.S.2d 401 .........................................................................8

*Griffin v. Oceanic Contractors, Inc.,*
    458 U.S. 564 (1982)..............................................................................................13

*Globe Indem. Co. v. Gilligan,*
   73 Misc. 2d 27 N.Y.S.2d 18 (Dist. Ct. 1973) ......................................................11

*Hobbs Brook Agency, Inc. v. North River Ins. Co.,*
   7 Mass. App. Ct. 885, 386 N.E.2d 1315 (1979) ..............................................8, 12

*Hutner v. Greene*,
   734 F.2d 896 (2d Cir. 1984)............................................................................5

*In re Interstate Stores,*1980 Bankr. LEXIS 5772 ......................................................11

*Lezak v. National Grange Mut. Ins. Co.,*
   233 N.Y.S.2d 607. (Sup.Ct. Kings Co. 1962)......................................................12

*Lloyd's v. Foster Wheeler Corp.,*
   *36 A.D.3d 17(1st Dept 2006)* ............................................................................15

*LMK Psychological Servs., P.C. v. State Farm Mut. Auto. Ins. Co.,*
   12 N.Y.3d 217 (2009) .........................................................................................6

*Olin Corp. v. Insurance Co. of N. Am.,*
   743 F. Supp. 1044 (S.D.N.Y. 1990) *aff'd,* 929 F.2d 62 (2d Cir. 1991) ................15

*Pallotta v. Physicians' Reciprocal Insurers,*
   137 Misc. 2d 223 N.Y.S.2d 105, 1987 N.Y. Misc.
   LEXIS 2673 (N.Y. Sup. Ct. 1987)......................................................................18

*Preserver Ins. Co. v. Ryba*
   10 N.Y. 3d 635 (2008) .........................................................................................3

*Schwartz v. Twin City Fire Ins. Co.*
   492 F. Supp.2d 308 (S.D.N.Y 2007) *aff'd sub nom.,*
   *Schwartz v. Liberty Mut. Ins. Co.,* 539 F.3d.135 (2d Cir. 2008).................5, 15, 16

*State Farm Mut. Auto. Ins. Co. v. Robert Mallela,*
   4 N.Y.3d 313, 321, 827 N.E.2d 758, 760 (2005)...................................................6

*Sweeney v. Preferred Mut. Ins. Co.,*
   43 A.D.3d 1395 N.Y.S.2d 915, (4th Dep't 2007)...................................................18

*Wausau  Business Ins. Co v. Horizon Administrative,*
   803 F.Supp.2d 902 (E.D.N.Y. July 21, 2011)....................................................15

*Zeller v. British Caymanian Insurance Company Ltd.,*
   [2008] UKPC 4 ..................................................................................................14

*Zogg v. Penn Mut. Life Ins. Co.*,
  276 F.2d 861 (2d Cir. 1960) ................................................................................3

*Zurich v. Shearson Lehman Hutton, Inc.*
  84 N.Y.2d 309 (1994) .....................................................................................16

<u>Statutes</u>

New York Insurance Law § 2121 ........................................................... *passim*

New York Insurance Law 3426 .................................................................................1

New York Insurance Law § 121 ............................................................. *passim*

<u>New York Department of Insurance Opinion Letters</u>

New York Insurance Department General Counsel Opinion 6-7-2002 ..................................4

New York Insurance Department General Counsel Opinion 3-9-1990 ..................................7

New York Insurance Department General Counsel Opinion 6-7-1990 ..................................7

New York Insurance Department General Counsel Opinion 5-9-1989 ..................................9

New York Insurance Department General Counsel Opinion 2-8-1982 ..................................7

**REPLY / OPPOSITION FACTUAL STATEMENT**

The parties are not in dispute about any facts material to MEL's motion for summary judgment. In April 2006, ACE renewed the products liability policy it had previously issued to MEL and Maclaren Hong Kong. The renewal was procured by a New York insurance broker named Rana Sahni. Sahni used a New York sub-broker, Program Brokerage to negotiate and obtain the renewal from ACE. ACE delivered the renewal policy to Program Brokerage in New York, which in turn delivered it to Sahni in New York. Before the existing policy expired, MEL wired the full premium for the renewal to Sahni's bank account in New York. Sahni never remitted the premium to Program Brokerage or ACE. ACE subsequently mailed a cancellation notice to MEL at Maclaren USA's address which did not meet the requirements of New York Insurance Law § 3426 (which ACE contends are inapplicable).

The facts about which the parties disagree are not material to MEL's summary judgment motions. The Court is respectfully referred to MEL's Local Rule 56.1 counterstatement for a recitation of those disputed facts. The disputes are over issues with no relevance to MEL's motion such as: how Maclaren USA's address got on the policy; ACE's refusal to accept the fact that MEL and Maclaren USA's status as separate entities with no common ownership; Maclaren USA's lack of authority to act for MEL in connection with the policy, and MEL's absence of knowledge of the cancellation notice.[1]

---

[1] While it has no bearing upon its motion, MEL particularly disputes the assertion by ACE that the statements ACE sent months after the cancellation notice (which unlike the cancellation notice, were forwarded to MEL by Maclaren USA) put MEL on notice that ACE had cancelled the policy. ACE Br. at 11. A review of these documents (Hugel Reply Dec., Exh. 3 at 3-4) will show the Court that, if anything, the documents sent by ACE would lead MEL to believe the policy was still in effect. A handwritten note on the statements shows that MEL's controller faxed them to Sahni asking him to look into it. *Id.* at 1. Email from Sahni shows that he continued to tell MEL that policy was in effect. Hugel Reply Dec., Exh. 5 at 1. Email from 2007 shows that MEL believed the policy remained in effect through April 2007. Hugel Dec., Exh. T.

None of these facts matter. MEL is not contending that ACE's mailing of the cancellation notice to Maclaren USA's address is what made the cancellation for non-payment defective. MEL's argument is that the cancellation was defective because MEL paid for the policy. The cancellation was also ineffective because it did not comply with New York law in its timing or its content.

This case is ripe for summary judgment. For the reasons stated below and in our main brief, we request that the Court grant MEL's motion for summary judgment and deny ACE's motion for summary judgment.

## REPLY/OPPOSITION ARGUMENT

**I.     NEW YORK INSURANCE LAW SECTION 2121 GOVERNS
        THE PAYMENT OF PREMIUM BY MEL TO SAHNI**

Since 1939, insurance companies doing business in New York have been required to bear the risk that a broker entrusted with premium will fail to remit it. This is a statutorily imposed cost of doing business in New York. With 73 years of experience in dealing with this risk, insurers can decide how best to address it. They can bill insureds directly, they can require prepayment of premiums or they can treat it like any other risk in the insurance industry, and incorporate it into the premium they charge. What they cannot do is cancel a policy for non-payment of premium when an insured had timely paid its broker.

ACE contends that New York Insurance Law § 2121 does not apply to the premium MEL paid to Sahni. ACE raises three arguments in support of this assertion. It argues that: 1) Sahni's authority to collect premiums for the 2006 renewal policy is governed by English law not New York Law; 2) only Program Brokerage was authorized to collect premium under § 2121; and 3) the premium payments is not covered by § 2121 because it was received by Sahni before ACE delivered the policy. Each of these contentions is legally incorrect.

2

ACE's argument against application of Insurance Law §2121 are addressed in detail below. Point A explains why Sahni's authority to receive premium for this policy is governed by New York law. Point B demonstrates that § 2121 applies to Sahni, even though he has no direct contact with ACE. Point C explains why MEL's payment of the premium to Sahni *before* the policy was renewed does strip MEL of the protection afforded by § 2121.

Prior to addressing these points, there is a threshold argument made by ACE that warrants brief attention. Section 2121, by its terms, applies when an insurer "delivers in this state to any insurance broker or any insured represented by such a broker a contract of insurance." According to ACE, § 2121 never comes in to play in this case because, "the policy was not delivered in this state." ACE Main Br at 21. This is a surprising argument, since ACE admits that it mailed the policy to Program Brokerage's office in New York City. ACE Rule 56.1 Statement at ¶ 59. ACE however, makes the perplexing argument that that a policy can only be "delivered" in New York if it covers "both insureds and risks in New York." ACE Br. at 21. ACE offers no precedent to support this argument (since none exist), but instead refers to cases discussing insurance statues that contain the phrase "delivered *or* issued for delivery" in New York. The cases cited by ACE define the later portion of that phrase, "issued for delivery," to mean a policy delivered outside New York but covering insureds and risks in New York. They make it perfectly clear that the first part of the phrase, "delivered," means exactly what it says—actual delivery in New York. *Preserver Ins. Co. v. Ryba* 10 N.Y. 3d 635 (2008) (stating that "delivery" in New York means "actually delivered" in New York); *Zogg v. Penn Mut. Life Ins. Co.*, 276 F.2d 861, 865 (2d Cir. 1960) (stating that "delivery" with respect to a mailing occurs where the policy is mailed *to* as opposed to where it mailed *from.*). Section 2121 is triggered by "delivery" of a policy to a New York broker, or to an insured anywhere in the world at the request of a New

York broker. ACE delivered the policy to a broker in New York when it mailed the policy to

Program Brokerage and thus indisputably triggered § 2121.[2]

**A.     New York Insurance Law § 2121 Governs
        Sahni's Authority to Collect Premium**

ACE first argues that Sahni's authority to receive premiums on behalf of ACE is

governed by English law rather than New York law. This is a patently absurd contention. A New

York insurance broker's obligations and powers as the dual-agent for the insured and the insurer,

*Bohlinger v. Zanger*, 306 N.Y. 228, 232, 117 N.E.2d 338, 340 (1954), are governed by the laws

of New York, regardless of the laws governing the policies he sells. Sahni was a broker operating

in New York under a license issued by the New York Department of Insurance. His authority

and duties as a broker were established by New York law, not the laws governing the insurance

policies he procured. A New York broker procuring an insurance policy containing a Croatian

choice of law clause is not required to determine Croatian law and conform his conduct to the

laws governing brokers in Croatia. Nor is he required to conduct his own choice of law analysis

where, as here, a policy he procures contains no choice of law provision.

New York Insurance Law § 2121 determines Sahni's authority to collect premiums on

behalf of ACE in this transaction regardless of what law governing the policy itself. Sahni's

authority to accept payment of a premium on behalf of ACE pertains not to the substance of the

parties' rights and obligations under their insurance contract, but to his independent capacity as a

broker, licensed in the State of New York, conducting business within the State's jurisdiction.

---

[2]   Even if ACE had initially mailed the policy to a non-New York broker, since the policy was
issued at the request of a New York broker and was forwarded to the insured through a New
York broker, § 2121 would still apply. *See* N.Y. Dep't Ins. Gen. Counsel Opinion 6-7-2002,
2002 WL 33011060.

Sahni's capacity to act as ACE's agent for the receipt of premiums is collateral to the policy and warrants separate treatment from the contract itself.

The doctrine of depecage refers to a concept in the conflict of laws whereby different issues within a particular case may be governed by the laws of different states. This doctrine "permits a nuanced handling of multistate situations" such that each issue is resolved according to the law of the jurisdiction with the strongest interest in regulating it. *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d.135, 152 (2d Cir. 2008) (citing *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 794 n.8 (2d Cir. 1980)). Within the context of contract-based claims, New York courts have frequently employed this principle in assessing which laws apply to the substance of the parties' agreement and which ones govern their separate rights and responsibilities to each other.[3] For instance, in *Hutner v. Greene*, 734 F.2d 896, 901 (2d Cir. 1984), the court applied the doctrine of depecage and determined that while a contract was governed by New York law, the plaintiff's right to receive compensation for brokering it was governed by California law. Thus, even if the insurance policy issued by ACE was governed by English law (which it is not), Sahni's duties and powers as an insurance broker involved in the transaction would still be determined under New York law.

**B.    Insurance Law § 2121 Applies to Sahni, Even Though He Did Not Deal Directly With ACE**

When multiple brokers are involved in the procurement of a policy, New York Insurance Law § 2121, empowers each broker in that chain to receive premiums on behalf of the insurer.

---

[3]  *See*, *e.g.*, *Schwartz v. Twin City Fire Co.*, 539 F.3d 135 (2d Cir. 2008)(holding that California law governed any interpretation of the parties' insurance contract, but that New York law controlled a bad faith claim between an insurer and excess insurer) (2d Cir. 2008); and *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d. 386, 395-397 (2d Cir. 2001) (enforcing a financing contract's choice-of-law provision, but holding that another state's law governed external relationships between the parties).

Several opinions by the New York Department of Insurance state that § 2121 applies to each broker involved in the procurement of the policy, even if he has no direct dealings with the insurer. This is consistent with the interpretation given to similar statutes in other states and the interpretation of § 2121 by a Massachusetts appellate court applying New York law.

ACE's contention that "only PBC can be deemed to be the agent of ACE for purposes of collection of premium under [section 2121]," flies in the face of at least three opinion letters issued by the New York Department of Insurance ("DOI"). Under well-established principles governing judicial deference to an administrative agency's interpretation of a statute within its regulatory sphere, the DOI's interpretation of the Insurance Law "will be upheld in deference to [its] special competence and expertise with respect to the insurance industry, unless it runs counter to the clear wording of a statutory provision." *State Farm Mut. Auto. Ins. Co. v. Robert Mallela*, 4 N.Y.3d 313, 321, 827 N.E.2d 758, 760 (2005).

Pursuant to Title 11, section 2.5 of the New York Official Compilation of Codes, Rules and Regulations, the DOI provides interpretations of the Insurance Law via opinion letters. In *Brentwood Pain & Rehab. Services, P.C. v. Allstate Ins. Co.*, 508 F. Supp. 2d 278, 291 (S.D.N.Y. 2007), Judge Chin found that DOI opinion letters unambiguously constituted "opinions" of an administrative agency. He found that, unless they were irrational or unreasonable, interpretations of the Insurance Law contained in these letters were entitled to deference. *Id.* at 293. The New York Court of Appeals subsequently reached the same conclusion in *LMK Psychological Services, P.C. v. State Farm Mut. Auto. Ins. Co.*, 12 N.Y.3d 217, 222 (2009).

The DOI has expressly rejected ACE's interpretation of § 2121 as applying only to Program Brokerage. As pointed out in MEL's main brief, DOI General Counsel Opinion 3-9-90

(1990 WL 10496587) states that under § 2121 "payment of premiums to a broker is equivalent to receipt by the insurer, *even though the insurer had no direct dealings with such broker*." *Id.* (emphasis added). The applicability of § 2121 to Sahni is made even more explicit in DOI General Counsel Opinion 2-8-82, which addresses the following question:

> The insured goes to Broker A, requesting a policy. Broker A, in turn, goes to Broker B, who procures the policy from the insurer. The insurer has had no dealings with Broker A, and may not even know there is a second broker involved. The insured timely pays Broker A, but Broker A does not remit the premium to either Broker B or the insurer. Must the insurer recognize the payment?

If "Broker A" is replaced with "Sahni" and "Broker B" is replaced by "Program Brokerage" this is a description of the facts in the present case. In response to this inquiry, the DOI provided the following interpretation of Insurance Law § 121 (now § 2121).

> **It is the Department's position that, for the purposes of Section 121, both Broker A & B would be treated as agents of the insurer and the insurer must recognize the payment of premiums even though they had no direct dealings with Broker A.**
>
> **It is presumably realized by the insurer that the broker with whom it dealt with may not be the broker with whom the insured dealt with and that, in fact, the policy might be delivered back to the insured through a chain of brokers.**

Hugel Reply Dec., Exh.1. (emphasis added). The DOI reaffirmed this interpretation of § 2121 in General Counsel Opinion 6-7-90 (1990 WL 10496698). That opinion letter, authored by the DOI General Counsel himself, states that under the DOI's interpretation of the Insurance Law, § 2121 "deems *each producer in the chain* an agent of the insurer for the receipt of premium." (emphasis added).

Since the DOI's interpretation of § 2121 is not unreasonable, it is entitled to deference by this Court. In view of the broad protective nature of § 2121, and the fact that it was "designed to relieve the insured from all risks stemming from a broker's possible dishonesty or insolvency"

*Greater New York Mut. Ins. Co. v. Axentiou*, 193 A.D.2d 474, 474, 597 N.Y.S.2d 401, 401 (1993), the DOI's interpretation of the law as encompassing all brokers in a chain, not just the final one, is reasonable and necessary. As acknowledged by ACE, the use of sub-brokers is a common practice in procuring insurance. If this routine industry practice eliminated the protection afforded by § 2121, the purpose of the law would be subverted and protection afforded to the public would be largely nullified. The reasonableness of the DOI's interpretation of § 2121 is further confirmed by *Hobbs Brook Agency, Inc. v. N. River Ins. Co.*, 7 Mass. App. Ct. 885, 886, 386 N.E.2d 1315, 1318 (1979) (interpreting New York law), the only decision of which we are aware addressing the applicability of § 2121 (then § 121) to a chain of brokers. In that case the court stated that applying the law to each broker in the chain was consistent with the protective purposes of the statute and the legislative intent to shift the losses caused by dishonest brokers to insurers. *Id. (*citing *Bohlinger v. Zanger*, 306 N.Y. 228, 237 (1954)).

Accordingly, the fact that ACE dealt only with Program Brokerage in issuing the policy has no bearing upon Sahni's authority under Insurance Law § 2121 to receive premiums on behalf of the ACE.

**C.    MEL's Payment of the Renewal Premium to
        Sahni Prior to Issuance of the Renewal Policy is
        Protected Under Insurance Law § 2121**.

In February 2006, MEL paid $45,000 to Sahni specifically for premiums due on renewal of its ACE liability policy. ACE argues that Insurance Law § 2121 does not apply to this payment because it was made to Sahni before ACE delivered the renewal policy. This crabbed interpretation of § 2121 is not warranted by the wording of the statute and is contrary to its avowed legislative purpose of "reliev[ing] the insured from all risks stemming from a broker's

possible dishonesty or insolvency." *Bohlinger v. Zange,r* 306 N.Y. 228, 237 (1954). Unsurprisingly, numerous courts in New York have rejected it.

Sahni's request for MEL to send him the renewal premium before the existing policy expired was neither improper nor unusual. As attested in the accompanying declaration of Antonio Acosta, an insurance broker with nearly 40 years of experience in the New York insurance industry, it is a common practice among New York insurance brokers to secure premiums prior to binding renewal coverage. Acosta Dec. at ¶ 3. The New York State Department of Insurance has observed that prepayment of premium, such as MEL made to Sahni is "a generally accepted practice." N.Y. Ins. Dep't. Gen. Counsel Opinion 5-9-89 (1998 WL 1586749). ACE's contention that insured's lose the protection provided by § 2121 when they pay their broker before a policy is delivered would create an entirely irrational and arbitrary gap in the protection afforded the public under § 2121.

Regardless of when a broker receives premiums from an insured, he is under a legal obligation to remit that premium to the insurer when due. N.Y. INS. LAW § 2120. It is "the responsibility of the insurer, rather than the insured, to ensure that the premiums paid to the broker are forwarded to the insurer." *Evvtex Co. v. Hartley Cooper Assocs.*, 911 F. Supp. 732, 739, (S.D.N.Y. 1996). Sahni's failure to remit the premium to ACE when it came due constituted a breach of Sahni's fiduciary obligations to ACE. It did not provide ACE a basis to cancel the coverage for non-payment.

Payments received by a broker for premiums in advance of the policy fall with scope of Insurance Law § 2121. This is consistent with its wording and purpose. Contrary to ACE's contention, nothing in § 2121 limits its effect to payments received by a broker *after* a policy is issued. Rather it states that payment to the broker is payment to the insurer if it is received *within*

90 days after the due date. Webster's Dictionary defines "within" to mean, "before the end of."

Webster's New Collegiate Dictionary (7th Ed 1976).

> The practical effect of the agency is to vest the broker with the authority to act for the insurance company in connection with receipt of premium, installment premium or additional premiums which become due or payable. In this regard, the 90–day provision in § 121 [now § 2121] did not operate to extend the time to pay premiums nor did it grant the broker authority to reinstate cancelled policies. Instead, it is simply a limit on the time within which a broker may receive moneys that become due and payable to an insurance company.

*Augustin v. Gilot*, 152 Misc. 2d 666, 672, 578 N.Y.S.2d 348, 352 (Civ. Ct. 1991) *rev'd on other grounds,* 158 Misc. 2d 627, 606 N.Y.S.2d 514 (App. Term 1993) (internal quotes and citations omitted)

The statute states that a payment received by a procuring broker before this 90-day deadline is deemed payment to the insurer. Nothing in this definition precludes an advance payment from falling within its scope. When a broker receives a payment from his client before any premium is due, the client simply has a credit with the broker for that amount. If no insurance policy is ever issued, then § 2121 never comes into play. However, once an insurer issues a policy requested by the broker, the credit held by the broker for the insured constitutes a payment to the insurer by operation of § 2121.

This was the conclusion reached by the court in *Gen. Fire & Cas. Co. v. Mackpat Corp.*, 33 A.D.2d 765, 306 N.Y.S.2d 314 (1st Dep't 1969). In that case, an insurer cancelled a policy for non-payment. The evidence showed that pursuant to an agreement between the insured and his broker, the broker held funds received by it as a credit for the payment of premium owed to the insurer. The First Department found that the trial court "was in error in ruling as a matter of law that payment by way of credit was unacceptable within the meaning of section 121 of the Insurance Law." *Id.* at 765-66.

The court in *Globe Indem. Co. v. Gilligan*, 41 N.Y.S.2d 18, 20 (Dist. Ct. 1973), also found that prepayments received by a broker fell within the scope of § 121 (now § 2121). The court stated that "The issue is whether the amount paid to the broker prior to the issuance of any policy by the present plaintiff constituted payment to the agent of the [insurer] so as to relieve the defendant of liability." *Id*. at 1. The court reasoned that "Although here the money paid to the broker was not paid after the issuance of the insurance policy by the plaintiff, it was money paid to the broker as agent for the [insurer]. This constituted a credit to the [insured's] account held by the broker and should be deemed as payment under § 121. *Id.*

A federal bankruptcy court addressed this same issue in *In re Interstate Stores*, 1980 Bankr. LEXIS 5772, 9. In this case, an insurer had filed a claim in bankruptcy for the premiums due on five insurance policies it had issued to the debtor. The Trustee established that the debtor had made multiple payments to its broker in excess of this amount for purposes of paying premium due to the insurer. The court had no difficulty concluding that payments constituted payment to the insurer under § 121, but the issue became one of timing and allocation. The court observed that no payments had been proffered for two of the policies at issue, but that $46,044 in excess payments had been paid to the broker for other policies. The court reasoned that

> This excess amount paid to the broker constitutes a credit to the insured
> and is deemed payment under § 121 [now § 2121]. The debtor is entitled
> to receive a full credit consistent with § 121 and the course of conduct
> between the parties, for all amounts paid to the broker.

*Id.* at *9 (internal citations omitted). Thus, the court rules that premium funds paid by the insured to its broker constituted a credit deemed to have been received by the insurer and that the insurer therefore had been paid in full.

Other cases have applied Insurance Law § 2121 (or its predecessor) to payments received by a broker before they were due. *See, e.g. C & F Fishing Corp. v. Dome Insurance Co., Inc.*, 81

CIV. 5474 (PNL), 1984 WL 488 (S.D.N.Y. June 15, 1984) (applying Insurance Law § 121 to down payment received by broker 3 days before policy issued); *Hobbs Brook Agency, Inc. v. N. River Ins. Co.*, 7 Mass. App. Ct. 885, 886, 386 N.E.2d 1315, 1318 (1979) (applying § 121 to prepayment received by broker for years two and three of three year policy). These decisions attributed no significance to the fact that the broker received the payments before the premiums were due and found them to constitute payments to the insurer.

　　While the majority of cases treat prepayment no differently from any other payment under § 2121 (or § 121), a handful of cases have reached a contrary conclusion. These cases have mostly involved facts not present in this case. *See A.I. Credit Corp v. Providence Washington Ins. Co.,* 96-cv-7955, 1998 WL 760232 (S.D.N.Y. 1998) (involving a premium finance lender's claim seeking to hold insurer's liable for funds advanced by it and stolen by broker); *18th Ave. Realty Corp. v. Aetna Cas. & Sur. Co.*, 240 A.D.2d 287, 288, 659 N.Y.S.2d 17, 18 (1997) (finding that funds held by broker on account for insured not deemed payment under § 2121 where "nothing in the documentary evidence submitted by the insured demonstrates that these premiums were payments in return for, or referable to, such policy").

　　The sole contrary case we have found with facts similar to the present case is a 1962 case from a King's County trial court, *Lezak v. National Grange Mut. Ins. Co.* 233 N.Y.S.2d 607. (Sup. Ct. Kings Co. 1962). In *Lezak* the insured paid his broker in advance for a renewal and the broker paid the insurer with a bad check. The court found that the insurer could cancel the policy for non-payment and that the insured, despite having paid his brokers in full, owed the insurance company the *pro-rata* premium for the period the policy was in effect. We respectfully suggest that the court reached the wrong result in that case. It ignored the Legislature's purpose in enacting § 121 and grossly misread the statute. This decision also predates the First

Department's decision in *Gen. Fire & Cas. Co.* that reached precisely the opposite conclusion. *Lezak* is an outlier and is neither binding nor persuasive. *Brentwood Pain & Rehab. Services, P.C. v. Allstate Ins. Co.*, 508 F. Supp. 2d 278, 293-94 (S.D.N.Y. 2007) ("While the Court must give 'proper regard' to state court rulings, these lower state court decisions are not controlling.").

For the past 73 years, the New York Insurance Law has contained a provision specifically created to protect insureds against the risk that their broker will fail to remit premium money to the insurance company. There is no logical reason that the Legislature would have intended to exclude from that protection an insured who prepaid his broker for a policy that the broker then procured. "Interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). Reading § 2121 to apply to prepayments received by a broker is consistent with the purpose of the statute, the wording of the law and the majority of court decisions.

ACE does not dispute that in February 2006, MEL wired $45,000 to Sahni specifically to pay for the renewal of the 2006 ACE liability policy. ACE Rule 56.1 Statement at ¶ 51. At the time that MEL's premium for the 2006 policy came due, MEL therefore had $45,000 on credit with Sahni specifically to pay ACE. Once ACE issued the policy, this was no longer a credit held by Sahni for MEL, but by operation of Insurance Law § 2121, became a credit held by Sahni as ACE's agent. While Sahni's failure to forward the actual funds to ACE was a breach of his fiduciary obligation to ACE, it does not change the fact that the payment to Sahni constituted payment of the premium to ACE.

Since MEL timely paid the full premium due for renewal of the policy in 2006, ACE's subsequently attempt to cancel the coverage for non-payment was improper and ineffective.

13

## II.   THE POLICY IS GOVERNED BY NEW YORK LAW

If, pursuant to Insurance Law § 2121, MEL is deemed to have paid the premium to ACE, it is irrelevant what law governs cancellation of the policy. Under either New York law or English law, an insurer's cancellation of a policy for non-payment of premium is ineffective if the premium was in fact paid.[4] Only if the Court finds that there was no payment of premium to ACE, would it need to determine what law governs cancellation of the policy. If the Court reaches that issue, the correct answer is that cancellation of the policy is governed by New York law.

Although ACE makes a lengthy argument as to why this Court should apply English law to the 2006 policy, its entire position is in fact contained in a single clause found on page 13 of its brief. According to ACE "the laws of England should be applied because the Subject Policy was issued to a named insured in England and the coverage is limited to international occurrences, claims and suits – and does not cover US occurrences, claims or suits." ACE offers no other reasons to support the application of English law. Under well-established New York law, the fact that one of the insureds on a policy covering worldwide risks is based in England does not provide a basis to apply English law to the policy.

Both parties agree that in contract disputes, New York uses a "center of gravity and grouping of contacts" choice of law analysis. This entails examining various contacts deemed to be significant that each jurisdiction has with the matter in dispute. "In cases involving insurance

---

[4] . *See Zeller v. British Caymanian Insurance Company Ltd.* [2008] UKPC 4 at ¶ 22 (holding that under English law insurer's notice of cancellation "was invalid and of no legal effect" where it was based upon insurer's erroneous assertion that insured had breached an obligation under the policy) (copy provided at Hugel Reply Dec at Exh 2); and *Bruckner Plaza Associates v. Generali Ins. Co. of Trieste & Venice, U.S. Branch*, 172 A.D.2d 408, 409, 568 N.Y.S.2d 786, 787 (1991) (holding under New York law that coverage cannot be cancelled for non-payment merely because "the broker may not have remitted payment to [the] defendant").

contracts, New York courts have looked principally to the following factors: the location of the insured risk; the insured's principal place of business; where the policy was issued and delivered; the location of the broker or agent placing the policy; where the premiums were paid; and the insurer's place of business." *Olin Corp. v. Ins. Co. of N. Am.*, 743 F. Supp. 1044, 1049 (S.D.N.Y. 1990) *aff'd,* 929 F.2d 62 (2d Cir. 1991). The location of the risk being insured is often considered the most important factor, but where an insurance contract covers risks in multiple jurisdictions, "it is commonplace for courts applying New York choice-of-law rules to disregard (or at least discount) the location of the insured risk." *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 152 (2d Cir. 2008). ACE's argument that the Court should use the headquarters of the insured as a proxy for the location of the insured risk pursuant to *Lloyd's v. Foster Wheeler Corp.* 36 A.D.3d 17 (1st Dep't 2006), ignores the fact that the policy has two named insureds MEL and Maclaren Hong Kong. The argument for application for Hong Kong law would be just as strong as the argument in favor of English law. When a policy covers more than one insured located in different jurisdictions, the *Foster Wheeler rule* does not provide an answer to the choice of law question. *See Wausau Business Ins. Co v. Horizon Administrative*, 803 F.Supp.2d 902 (E.D.N.Y. July 21, 2011) (finding *Foster Wheeler* inapplicable where insurance policy contained multiple named insureds).

Contrary to ACE's contention, the location of MEL's headquarters is not a shortcut for the choice of law analysis. This Court has specifically rejected the notion that the location of the insured dictates the appropriate choice of law for an insurance policy. *Gerling Am. Ins. Co. v. Steadfast Ins. Co.*, 00 CIV. 7907 (HB), 2001 WL 936288 at n.6 (S.D.N.Y. Aug. 17, 2001) ("Although the Insureds are located in Pennsylvania, this fact, although not unimportant, is simply insufficient to outweigh the contacts to New York."). When the Court looks at each of the

salient factors, the center of gravity for this contract is New York. The insured risk is not located in any particular jurisdiction; the insureds' headquarters are in England and Hong Kong; the insurer is based in Pennsylvania; the policy was negotiated in New York; it was paid for in New York, it was delivered in New York and it was procured by two brokers, both of whom are in New York. ACE maintais an office in New York and has been regulated by the New York State Insurance Department (now known as the Department of Financial Services) for over 30 years.[5] New York has more contacts with this policy than any other jurisdiction. It is the center of gravity and its law should apply to cancellation.

While governmental interest is not typically considered in the grouping of contacts analysis, the analysis may nevertheless be informed by considerations of the policies underlying conflicting laws. *See Zurich v. Shearson Lehman Hutton, Inc.,* 84 N.Y.2d 309, 318-19 (1994). New York has a long history as one of the world's financial and insurance centers. *Schwartz v. Twin City Fire Ins. Co.*, 492 F. Supp. 2d 308, 327-28 (S.D.N.Y. 2007) *aff'd sub nom. Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135 (2d Cir. 2008). "The significant presence of the insurance industry within the state yields a strong interest in its regulation." *Id.* (applying New York law to bad faith claim against an insurer). In furtherance of its regulation of the insurance industry, the New York Legislature has seen fit to provide protections to insureds that, according to ACE, are not found in English law (i.e. laws shifting the risk of a broker's dishonesty to the insurer and establishing strict limitations on an insurers' ability to cancel coverage once bound); and it has not limited those protections to New York residents. New York's interests in these laws are clear – they protect New York residents and advance New York's interest in remaining a place where people and business from around the world come to buy insurance. England, on the other hand,

---

[5] ACE's history as a licensee of the NYS Dep't. of Financial Services (DFS) is available at the DFS website https://myportal.dfs.ny.gov/web/guest-applications/ins.-company-search.

has no interest in applying its laws to this policy. While England may have an interest in protecting its colossal insurance industry[6] by making it easy for insurers to cancel coverage, that interest has no bearing upon a policy purchased in New York from an U.S. insurance company. To the extent that the Court considers governmental interest in determining the appropriate choice of law for this policy, New York's interest in this transaction far outweighs England's.

Since New York is the center of gravity for the policy, it must be cancelled in accordance with New York's cancellations rules. New York's rules for cancellation of commercial lines insurance are contained in Insurance Law § 3426. That section unambiguously applies to this policy.

Insurance Law § 3426(a)(1) defines a "covered policy" for purposes of that section as *inter alia*, "a policy of commercial risks insurance." The 2006 renewal policy which covered MEL and Maclaren Hong Kong against products liability suits is unarguably a "covered policy" under this definition. Section 3426(c) contains a list of requirements that must be met for an insurer to effectively cancel a "covered policy" that has been in place for 60 days or which is a renewal.[7] In such instances, the insured must be given 15-days notice prior to cancellation and the notice must state the amount due if the cancellation is for non-payment. § 3426(c) and (c)(1)(A). ACE's cancellation notice provided only 13-days notice and did not state the amount due. Hugel Dec., Exh. S. It therefore was not in compliance with Insurance Law § 3426.

ACE's argument that this policy is excluded from § 3426's protection of by operation of § 3426 (l)(1) is based upon a misreading of the statute. By its terms, § 3426(c) applies to

---

[6] According to a 2009 report by the U.K. Treasury, insurers operating in the U.K. control assets that account for around 25% of the U.K's total net worth. REPORT OF H.M. TREASURY INSURANCE INDUSTRY WORKING GROUP (July 2009) at p. 40, *available at* http://www.hm-treasury.gov.uk/d/fin_insuranceindustry270709.pdf.

[7] The 2006 policy was both a renewal and had been in effect for 91 days as of the cancellation date. Hugel Dec., Exh. S.

"covered policies," provided that they are renewals or in effect for 60 days. Section 3426(l)(1) does not carve out a class of "covered policies" from the protection of § 3426(c). Rather, it states that certain multi-state risk policies (some of which presumably fall outside the definition of "covered policies") are nevertheless also governed by § 3426. The only "covered policies" excluded from the protections afforded by § 3426(c) are those explicitly carved out by section 3426(l)(2) – i.e. surety policies, workers compensation polices, credit insurance, etc. ACE does not contend that the 2006 policy is a type of coverage on the § 3426(l)(2) carve-out list. Accordingly, since New York law applies and the 2006 renewal is unambiguously a "covered policy" as defined by § 3426(a)(1), it could only be cancelled in compliance with § 3426(c).

ACE's failure to cancel the policy in accordance with the requirements of § 3426(c) renders its purported cancellation void. "With respect to a notice of cancellation of an insurance policy, literal compliance with the provisions of the . . . [applicable] statutes is the rule. *Sweeney v. Preferred Mut. Ins. Co*., 43 A.D.3d 1395, 1395 (4th Dep't 2007). Pursuant to Insurance Law 3426(i), any defect in a cancellation notice renders it ineffective and void. *See also Pallotta v. Physicians' Reciprocal Insurers*, 137 Misc. 2d 223, 226, 520 N.Y.S.2d 105, 1987 N.Y. Misc. LEXIS 2673 (N.Y. Sup. Ct. 1987); and cases cited at page 22 of MEL's main brief. ACE's facial defective cancellation notice had no legal effect, and therefore the 2006 policy continued in full force and effect until it expired in April 2007.

**CONCLUSION**

For the reasons stated herein, in our main brief and upon the declarations and exhibits submitted therewith, Plaintiff Maclaren Europe Limited asks that the Court deny defendant ACE's motion for summary judgment, grant MEL's motion for summary judgment and enter a judgment declaring that the policy of insurance issued to Plaintiff by ACE effective April 4, 2006, remained in full force and effect through April 4, 2007.

Dated:  New York, New York
      June 25, 2012

                       CLAYMAN & ROSENBERG LLP
                       ATTORNEYS FOR PLAINTIFF

By:    _____/s_____
         Paul S. Hugel (PH4749)
         305 Madison Avenue - Suite 1301
         New York, New York 10165
         (212) 922-1080 phone
         (212) 949-8255 facsimile