UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MACLAREN EUROPE LIMITED,          :
                                  :
              Plaintiff,          :
                                  :     OPINION & ORDER
        -against-                 :
                                  :     11 Civ. 4688 (HB)
ACE AMERICAN INSURANCE COMPANY,   :
                                  :
              Defendant.          :
------------------------------------------------------------X

**Hon. HAROLD BAER, JR., District Judge:**

  Maclaren Europe Limited ("MEL") and ACE American Insurance Company ("ACE") each move for summary judgment. The principal issues before the Court are whether MEL's prepayment of the 2006 renewal premium to its retail broker, Indebir Sahni, is in fact payment to ACE, and, if not, whether ACE properly canceled the 2006 policy for nonpayment. Under English law, there is no dispute that ACE would prevail. Under New York law, the parties dispute nearly every section of New York insurance law applicable to the facts here. For the following reasons, New York law applies, and ACE is charged with receipt of the premium.

## Background[1]

  In April 2006, ACE renewed the insurance policy it had previously issued to MEL and Maclaren Hong Kong, a related entity. The renewal was procured by a New York retail insurance broker, Sahni, who used a New York wholesale broker (or sub-broker), Program Brokerage Corporation ("PBC"), to negotiate and obtain the renewal from ACE. ACE delivered the renewal policy to PBC in New York, which in turn delivered it to Sahni in New York. Before the then-existing policy expired (but before ACE issued the 2006 renewal), MEL wired an anticipated renewal premium to Sahni's bank account in New York. Sahni never remitted the premium to PBC or ACE. ACE subsequently mailed a cancellation notice to MEL at Maclaren USA's address in Connecticut.

---

[1] These facts are taken from the undisputed portions of the parties' Rule 56.1 statements.

1

**Discussion**

A district court may not grant summary judgment if there exists a genuine issue of material fact. *See Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "For summary judgment purposes, a 'genuine issue' exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor." *Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co.*, 421 F. App'x 52, 53 (2d Cir. 2011) (internal citations omitted). The parties point to no disputed issues of material fact, and the Court finds none. Below, I begin with a discussion of the prepayment of the premium under New York law. I find that MEL is entitled to summary judgment, and, because this conflicts with English law, I end with a choice-of-law analysis and determine that New York law controls.

**I.      Under New York Law, MEL's Prepayment of the Renewal Premium to Sahni was Charged to ACE at the Moment PBC Delivered the Policy to Sahni**

   *A.     Insurance Agents and Brokers*

It is common for an insured and an insurer to negotiate and enter into a contract of insurance through intermediaries. A "broker" is the representative of the insured,[2] and an "agent" of the insurer.[3] *See Bohlinger v. Zanger*, 117 N.E.2d 338, 339 (N.Y. 1954). While agency principles are bound up with each type of relationship, the law of agency and the duties of an insurance agent are not necessarily identical. In the instant case, Sahni and PBC are both brokers acting on behalf of MEL. Therefore, neither Sahni nor PBC have the authority to represent ACE, unless there is some other reason to treat them as agents of ACE. *See* 3 COUCH ON INS. § 45.5 (revised 3d ed. 2011) ("[Absent] the existence of special circumstances . . . a broker may not be converted into an agent for the insurer without some action on the part of the insurer or the existence of some facts that indicate that the broker has the authority to represent the insurer.").

---

[2] An "insurance broker" is "any person, firm, association or corporation who or which for any compensation, commission or other thing of value acts or aids in any manner in soliciting, negotiating or selling, any insurance or annuity contract or in placing risks or taking out insurance, on behalf of an insured other than himself, herself or itself or on behalf of any licensed insurance broker . . . ." N.Y. INS. LAW § 2101(c) (McKinney 2012).

[3] An "insurance agent" is "any authorized or acknowledged agent of an insurer, fraternal benefit society or health maintenance organization . . . , and any sub-agent or other representative of such an agent, who acts as such in the solicitation of, negotiation for, or sale of, an insurance, health maintenance organization or annuity contract, other than as a licensed insurance broker . . . ." N.Y. INS. LAW § 2101(a) (McKinney 2012).

B.     *New York Insurance Law Section 2121*

Section 2121 of the New York Insurance Law contains such an exception to the general rule that an insurance broker is the agent only of the insured.

> Any insurer which delivers in this state to any insurance broker . . . a contract of insurance pursuant to the application or request of such broker, acting for an insured other than himself, shall be deemed to have authorized such broker to receive on its behalf payment of any premium which is due on such contract at the time of its issuance or delivery or payment of any installment of such premium or any additional premium which becomes due or payable thereafter on such contract, provided such payment is received by such broker within ninety days after the due date of such premium or installment thereof or after the date of delivery of a statement by the insurer of such additional premium.

N.Y. INS. LAW § 2121(a) (McKinney 2012). Section 2121(a) is "designed to relieve the insured from all risks stemming from a broker's possible dishonesty or insolvency." *Bohlinger*, 117 N.E.2d at 342 (Fuld, J., dissenting). When an insurer gives a policy to a broker for delivery to the insured, the insurer in effect extends credit to the broker, and the broker is thereby held to be an agent of the insurer for the purpose of the payment of the premium on that policy. *See Evvtex Co., Inc. v. Hartley Cooper Assocs. Ltd.*, 911 F. Supp. 732, 739 (S.D.N.Y. 1996), *aff'd*, 102 F.3d 1327 (2d Cir. 1996); *Globe & Rutgers Fire Ins. v. Lesher, Whitman & Co.*, 215 N.Y.S. 225, 228–29 (City Ct. 1926). Thus, while a broker is typically in privity solely with the insured, the insurer "impliedly consents to [the broker's] collection of the premium by delivering the policy of insurance to [the broker]." *Lezak v. Nat'l Grange Mut. Ins.*, 233 N.Y.S.2d 607, 609 (Sup. Ct. 1962). The effect of § 2121 is therefore to place a broker in a dual role. *See Globe Indem. Co. v. Gilligan*, 341 N.Y.S.2d 18, 20 (Dist. Ct. 1973) ("[The broker] is agent for insured for obtaining insurance coverage and he becomes agent for insurer for purpose of receiving payment." (citing *Bohlinger*, 117 N.E.2d 338)); *see also C & F Fishing Corp. v. Dome Ins.*, No. 81 CIV. 5474 (PNL), 1984 WL 488, at *2 (S.D.N.Y. June 15, 1984).

This brings me to conclude that ACE vested PBC, the whole-sale broker, with the authority to receive the premium on behalf of ACE. ACE argues that § 2121 extends no further than to PBC as the agent of ACE, but at no time was Sahni ACE's agent. Def.'s Opp'n 12–13.

C.     *Sub-Agents*

An agent may authorize subagents to perform in accordance with authorization from the principal, and the subagent "affects the relations of the principal to third persons as fully as if the

appointing agent had done such acts." RESTATEMENT (SECOND) OF AGENCY § 5(1) cmt. d (1958); *see also id.* § 142, cmt. b; *Isaac et al. v. D. & C. Mutual Fire Ins.*, 162 A. 300, 301 (Pa. 1932) ("Where a duly authorized insurance agent, in the due prosecution of the business of his company, employs another as a subagent to solicit insurance and perform other acts in relation thereto, the acts of the subagents, within the scope of the delegated authority, have the same effect as if done by the agent himself."). Subagents are quite common in the insurance industry. In fact, PBC acted as a subagent, or sub-broker, to MEL when it procured a policy from ACE at Sahni's request.

There is no reason that the sub-agency relationship should not run the other way as well. *See* 68 N.Y. JUR. 2D INSURANCE § 476 ("Generally, the business of an insurance agent, either in issuing policies or soliciting insurance, is not of such a discretionary or personal nature that it cannot be delegated."); 3 COUCH ON INS. § 54:20 ("An insurer is . . . bound by the acts of a subagent when, knowing of his or her appointment, the insurer takes no steps to repudiate the appointment."); *id.* § 54:19 ("In the absence of a known limitation on the agent's authority to the contrary, the agent may employ: . . . Subagents to deliver policies and collect premiums."); *see also Cullinan v. Bowker*, 72 N.E. 911, 914 (N.Y. 1904).

In *Hobbs Brook Agency, Inc. v. North River Insurance Co.*, 386 N.E.2d 1315, 1317 (Mass. 1979), the court, applying New York law, held that there was sufficient evidence to support a finding that the insurer knew that its agent would deliver the policy to the subagent who would in turn receive the premium. The court considered the insurer as having "delivered" the policy to the subagent within the meaning of § 2121. This interpretation furthers the goals of § 2121 and is entirely consistent with agency principles, and it is not, I might add, a new concept. *See Central Ohio Ins. v. Lake Erie Provision Co.*, 7 Ohio Circ. Dec. 562 (Cir. Ct. 1895) (holding that under a similar statute a payment of the premium to the retail broker, or subagent, was a payment to the insurer). It is no coincidence, then, that this is also the opinion held by the New York Insurance Department. *See* N.Y. Gen. Counsel Op. No. 3-9-90 (#2), 1990 WL 10496587 ("The Department has long held the position that the insurer must accept that payment of premiums to a broker is equivalent to receipt by the insurer, even though the insurer had no direct dealings with such broker. It should be recognized that there might be a chain of brokers in delivering the policy to the insured, which must be regarded as having been done under the authority of the insurer." (internal citations omitted)).

Therefore, pursuant to § 2121, ACE must be charged with receipt of the premium. PBC was an agent of ACE for the limited purpose of receiving on ACE's behalf the payment of any premium which was due on the policy issued at PBC's request. The New York Insurance Department has gone even further to say that "[i]t is presumably realized by the insurer that the broker with whom it dealt with may not be the broker with whom the insured dealt with" and that the insurer must recognize the payment of premiums to the subagent even where the insurer does not know there is a second broker involved. N.Y. Gen. Counsel Op. No. 2-8-82, 1982 WL 885482. We need not go so far as to determine whether this language is a reasonable extension of the knowledge requirement suggested by the *Hobbs Brook* court. PBC is a wholesale broker—which may be a sufficient basis standing alone to infer that there is a retail broker who will deliver the policy—and Sahni's existence was apparent in emails and the application from PBC. Pl's Ex. Q. And the renewal of the 2006 policy followed the same pattern as the renewal of the 2005 policy. Pl.'s 56.1 ¶¶ 13–15; Def.'s 56.1 ¶¶ 46–48. The moment PBC delivered the 2006 policy to Sahni, *see* William Devito Decl. ¶ 10 (June 13, 2012), Sahni was a sub-agent of ACE and could receive the premium on ACE's behalf.

   D.   *Prepayment of Premiums*

ACE argues that it is only *after* the policy has been delivered to a broker that the broker may accept payment of the premium on the insurer's behalf. Def.'s Supp. 22. This is only partly true. Yes, the "authority of [a] broker to act in [a] dual capacity . . . extends only to [the] period in which the policy remains in force and after its delivery to him." *Lezak v. Nat'l Grange Mut. Ins.*, 233 N.Y.S.2d 607, 609 (Sup. Ct. 1962). "It necessarily excludes the period between which the broker is engaged by the prospective insured to secure a policy of insurance and the receipt of the policy from the insurer by the broker. During this interval he is in privity solely with his customer and does not establish any privity with any insurance company until the latter impliedly consents to his collection of the premium by delivering the policy of insurance to him." *Id*. But this limitation on the period for which the broker may act as an agent for the insurer does not also limit the period during which the broker may act as a fiduciary for the insured.

The rule can be stated as follows: For receipt of a premium by a broker to establish an enforceable policy, there will be an overlapping period of time during which the broker simultaneously acts as a fiduciary for the insured and as an agent of the insurer for the specific policy in question. *Cf. 18th Ave. Realty Corp. v. Aetna Cas. & Sur. Co.*, 659 N.Y.S.2d 17, 18–19

(N.Y. App. Div. 1st Dep't 1997) (holding that the insurer was not charged with receipt of the premium where the broker, prior to issuance of the policy, received returned unearned premiums from a prior insurer but which were not referable to the policy at issue); *A.I. Credit Corp. v. Providence Wash. Ins.*, No. 96 CIV. 7955 (AGS), 1998 WL 760232, at *7 (S.D.N.Y. Oct. 29, 1998) (holding the same where the policies were issued after the broker received premium advances pursuant to unrelated premium finance agreements). This period of time may run from the delivery of the policy through to the ninety-day limit imposed by § 2121(a). *See Standard Acc. Ins. v. Roth*, 213 N.Y.S.2d 721, 724 (Sup. Ct. 1961) ("The ninety day provision . . . may not be considered as a period of extension of time to pay premiums, or a grant of authority to reinstate cancelled policies. Instead, it is simply a limit on the time within which a broker may receive moneys that become due and payable to an insurance company."). So long as there is a moment when the broker acts in this dual capacity, the premium must be charged to the insurer. *See Globe Indem. Co.*, 341 N.Y.S.2d at 20 (charging to the insurer the receipt of the premium that was paid to the broker prior to the issuance of the policy); *see also Riley v. Commonwealth Mut. F. Ins.*, 1 A. 528, 529–30 (Pa. 1885) (same).

PBC delivered the policy to Sahni, who was then simultaneously a depositee and agent for the insurer and a fiduciary for the insured. That Sahni may have already breached his fiduciary duty to MEL (by converting the premium for his own benefit), does not mean he was no longer a fiduciary. It also matters little whether the broker receives the premium before or after the delivery of the policy. What does matter is MEL's payment was intended for the policy ultimately delivered to Sahni by PBC.[4]

## II.     New York Law Applies

New York's choice-of-law rules govern. *See Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 582 (2d Cir. 2006) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)).

---

[4] ACE disputes that the money "was specifically ear-marked for the renewal with ACE of the [2005] policy", and notes that MEL rejected initial renewal quotes. Def.'s Response to Pl.'s 56.1 ¶ 20. This is an unreasonable restriction on the scope of Sahni's fiduciary duty with respect to the money he held on behalf of MEL. Sahni was responsible for procuring a policy to replace the soon-expiring 2005 policy. That is exactly what he did and what the money was meant for. In fact, Sahni acted responsibly (initially, at least) by seeking additional quotes when ACE's 2006 proposed premium was notably higher than for the 2005 policy. *See* Hugel Decl. Ex. R (June 13, 2012).

A.     *Conflict with English Law*

To determine what substantive law applies under New York choice-of-law rules, "'[t]he first step . . . is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'" *Schwartz v. Liberty Mutual Ins.*, 539 F.3d 135, 151 (2d Cir. 2008) (quoting *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 223 (1993)). Actual conflicts exist "[w]here the applicable law from each jurisdiction provides different substantive rules . . . ." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). Pursuant to English law, "where an insurance company appoints a particular person to receive the premiums, that person cannot appoint anyone else to receive them on his behalf, unless authorized by the company to do so." MACGILLIVRAY ON INS. LAW 7-005 (Sweet & Maxwell eds., 10th ed. 2003).[5] In other words, unlike under New York law, Sahni could not have received the premium on behalf of PBC or ACE.

B.     *Choice of Law*

Choice-of-law questions are analyzed using a "center of gravity" approach to determine which state has the most significant relationship to the dispute at issue. *Zurich Ins. Co. v. Shearson Lehman Hutton*, 642 N.E.2d 1065, 1068 (N.Y. 1994).

> [C]ourts applying New York law have examined the following factors, listed in the Restatement on Conflict of Laws § 193 in the context of an insurance policy with risks spread throughout multiple states: the location of the insured risk; the insured's principal place of business; where the policy was issued and delivered; the location of the broker or agent placing the policy; where the premiums were paid; and the insurer's place of business.

*Lumbermens Mutual Cas. Co. v. RGIS Inventory Specialists, LLC*, No. 08 Civ. 1316 (HB), 2009 WL 137055, at *5 (S.D.N.Y. Jan. 21, 2009) (internal quotation marks omitted), *aff'd*, 628 F.3d

---

[5] The parties also find a conflict in the requirements of a notice of cancellation. Because I find that MEL did pay the premium, ACE's cancellation for non-payment was improper. I pause to note, however, that both parties misinterpret the application of New York Insurance Law § 3426, which establishes minimum cancellation and nonrenewal provisions for certain commercial insurance policies. MEL argues that the requirements of this section apply and that ACE failed to issue a compliant notice. The parties focus on the language of § 3426(l) and argue about whether or not this subsection limits the applicability of the section to policies that cover risks located in New York. Both are looking in the wrong direction. A "covered policy" under this section is "a policy of commercial risk insurance, professional liability insurance or public entity insurance, and shall include any contract, certificate or other evidence of such insurance." *Id.* § 3426(a)(1). A policy of "commercial risk insurance" is already limited to "insurance . . . issued or issued for delivery in this state, on a risk located in this state . . . ." *Id.* § 107(47); *see also* N.Y. Gen. Counsel Op. No. 8-6-2002(#3), 2002 WL 33011106 (US), 2.

7

46 (2d Cir. 2010).[6] "It is commonplace for courts applying New York choice-of-law rules to disregard (or at least discount) the location of the insured risk when the risk is located in two or more states." *Schwartz*, 539 F.3d at 152 (internal quotation marks omitted). In cases where the insured risk is located in multiple states, "the state of the insured's domicile [has been regarded as] a proxy for the principal location of the insured risk, which, under New York law and Restatement § 193, is the controlling factor in determining the law applicable to a liability insurance policy." *Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.* (*"Foster Wheeler"*), 822 N.Y.S.2d 30, 37 (N.Y. App. Div. 1st Dep't 2006). But just as with risks located in multiple jurisdictions, where the policy covers insureds in different locations, that factor is again discounted. *See Wausau Bus. Ins. Co. v. Horizon Admin. Services LLC*, 803 F. Supp. 2d 209, 215–16 (E.D.N.Y. 2011). "[I]n certain instances 'the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests, and therefore should be considered.'" *Zurich*, 642 N.E.2d at 1069 (quoting *Matter of Allstate Ins. Co. [Stolarz-N.J. Mfrs. Co.],* 613 N.E.2d 936, 939 (N.Y. 1993)).[7]

      Given the widely dispersed factors in this case, the center of gravity is not readily determined. The locations of the insured risks are Europe and Hong Kong. The first named company on the policy is a Connecticut corporation, Maclaren USA. The insureds' domiciles are England and Hong Kong, the insurer Pennsylvania. ACE is licensed by the New York State Insurance Department, maintains an office in New York, and solicits business through brokers and agents in New York. The policy was placed through two brokers, both of whom were located in New York and operated under licenses issued by the New York Insurance Department. Payment of the premium for the policy was made to a broker in New York, by wiring funds to the brokers' New York bank account. The policy passed through the hands of the brokers in New York and was ultimately delivered to the Connecticut Maclaren affiliate. In my view, the weighted average location of the interests rests in New York. *Cf. Olin Corp. v. Ins. Co. of N. Am.*, 743 F. Supp. 1044, 1049 (S.D.N.Y. 1990) (applying New York law even though insured

---

[6] The Second Circuit has considered a slight variation of these factors in the context of contract disputes. *See Maryland Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151–52 (2d Cir. 2003).

[7] "Theoretically, in a proper case, a foreign State's sufficiently compelling public policy could preclude an application of New York law otherwise indicated by the grouping of contacts analysis, particularly where New York's policy is weak or uncertain." *Zurich*, 642 N.E.2d at 1069. However, the *Zurich* court declined to do so where New York's underlying policy was "unambiguous." *Id.*

risk was not confined to one location where "the significant aspects of contract formation occurred in New York," such as negotiations, issuance, and delivery of policies, and plaintiff had office and broker located in New York).

Governmental interests tilt towards New York as well. "Although the grouping of contacts analysis is the primary analytical tool to be used in resolving choice-of-law issues relating to contracts, strong governmental interests should be considered where such interests are readily identifiable." *Northland Ins. v. Imperial Car Sales, Inc.*, No. 08 Civ. 3299, 2009 WL 2143565, at *4 (E.D.N.Y. July 17, 2009) (internal quotation marks omitted).

> The governmental interests implicated by an insured's claim against an insurer of risks located in multiple states are those in: (1) regulating conduct with respect to insured risks within the state's borders; (2) assuring that the state's domiciliaries are fairly treated by their insurers; (3) assuring that insurance is available to the state's domiciliaries from companies located both within and without the state; and (4) regulating the conduct of insurance companies doing business within the state's borders.

*Foster Wheeler*, 822 N.Y.S.2d at 34. ACE argues that England has "the greatest governmental interest in protecting its insureds and claimants from early cancellation of an insurance policy but has elected to leave such procedures in the hands of the parties to the insurance contract." Def. Supp. 14; *see also* Def. Opp'n 19. *Foster Wheeler* would seem to support this view:

> In the case of a corporate insured seeking coverage under a policy covering risks in multiple states, the foregoing interests, in aggregate, weigh in favor of applying the law of the insured's domicile, notwithstanding that certain other states (e.g., the states of the insurer's domicile, and where negotiation and contracting occurred) may share, to a lesser extent, in the fourth interest enumerated above[.]

*Foster Wheeler*, 822 N.Y.S.2d at 34. But it is the fourth interest—regulating the conduct of insurance companies doing business in New York—that is the most significant in this case. The insurance policy here covers insureds in England and Hong Kong and risks in Europe and Hong Kong. ACE's silence with respect to China's interest speaks volumes. This confirms for me that the interests at stake are less about the construction of the policy than they are "the authority of the New York–based brokers that procured the polic[y]". *Id.* at 34 n.2. Noteworthy as well is the somewhat curious position of ACE, a domestic insurer doing business out of New York, which seeks to have foreign law apply to a contract where foreign entities came here specifically to use the services of New York brokers.

## Conclusion

I have considered the parties' other arguments and find them without merit. MEL's motion for summary judgment is GRANTED, and ACE's motion DENIED. ACE is charged with receipt of the premium. The Clerk of Court is instructed to close the open motions, close the case, and remove them from my docket.

SO ORDERED.

Date: 11/5/12
New York, New York

HAROLD BAER, JR.
United States District Judge

10